THE STATE OF NEW JERSEY, RESPONDENT, v. REGINALD O. DRIVER, JR., DEFENDANT-APPELLANT.

Argued April 23, 1962—Decided July 19, 1962.

See, also, 38 *N. J.* 294, 183 *A.* 2*d* 676.

*Mr. John J. Barry,* First Assistant Prosecutor, argued the cause for respondent (*Mr. Stanley E. Rutkowski,* Mercer County Prosecutor, attorney).

*Mr. Edward B. Meredith* argued the cause for defendant-appellant (*Messrs. Hervey S. Moore, Jr.* and *Edward B. Meredith,* attorneys).

The opinion of the court was delivered by

FRANCIS, J. Defendant, Reginald O. Driver, Jr., was convicted of murder in the first degree arising out of a robbery, and pursuant to the jury's recommendation was sentenced to life imprisonment. He has appealed directly to this court. *R. R.* 1:2–1(*c*).

The victim, Jacob Mayer, was manager of the A & P Supermarket on South Broad Street in Hamilton Township, Mercer County, New Jersey. On Good Friday, April 4, 1958, the store remained open until 10 P. M. Mayer left at about 10:30 P. M., after locking the door and taking the key with him. He drove away in a 1947 Dodge belonging to his father-in-law. Mrs. Mayer was already in bed when her husband reached home. The sound of the key in the

kitchen door awakened her. She heard her husband's voice but the record does not show how soon that was after she awakened. There was nothing about his tone which indicated apprehension. He said, "You guys" or "Oh, you guys." (On motion, the trial court struck out the reference to his comment. The ruling was improper, as the statement was part of the *res gestae*. It was an undesigned incident of the criminal event that was beginning to unfold. Its nature and apparent spontaneity might be taken by the jury as an indication that Mayer's visitors were known to him. See *Hunter v. State,* 40 *N. J. L.* 495, 538, 539 (*E. & A.* 1878); *State v. Doro,* 103 *N. J. L.* 88, 93, 94 (*E. & A.* 1926); *State v. Stephan,* 118 *N. J. L.* 592 (*E. & A.* 1937); 1 *Underhill, Criminal Evidence* (*5th ed.* 1956) § 266.) Shortly thereafter she observed the lights of an automobile going out of her driveway. When her husband had not returned by 2:30 A. M., she made an unsuccessful search for him, and finally called the police.

Early on the morning of April 5 the police went to the A & P Supermarket with the Assistant Manager. There they found the safe had been opened and the cash usually kept there was missing. A subsequent audit fixed the loss at $10,468.21 in cash and $505.17 in checks.

Around 7 A. M. on April 5, a fisherman noticed a burned 1947 or 1948 Dodge coupe standing near a footbridge between Carnegie Lake and the Delaware-Raritan Canal in Princeton Township. The car was still smoking. The police were not notified, however, until the following day, Sunday, when another visitor to the area saw it and made a report. The waters of the lake and the canal were then searched until April 10, when the body of Mayer was found in the canal in about eight feet of water. Examination showed a laceration of his scalp above the right ear. Two-inch adhesive tape had been wound around his wrists, mouth, eyes, nose and neck. The tape around the neck was very tight and twisted. Death had not resulted from drowning but from strangulation. The autopsy physician indicated that the

tape on Mayer's neck had prevented breathing, and had probably produced death in three to five minutes.

Police investigation uncovered circumstances and alleged admissions to third persons which pointed toward involvement in the crime of Driver and possibly his brother-in-law, David Mills. Interrogation of Driver, to be considered hereafter in more detail, allegedly produced further inculpatory statements, and he was charged with murder on December 11, 1959. Defense attorneys were not assigned until May 1960. A four-week trial began on May 15, 1961, and resulted in the verdict referred to above. Numerous grounds for reversal have been presented. Some of them, to be discussed herein, are meritorious and require a new trial.

## I.

### References to the Lie Detector Test.

In the Assistant Prosecutor's opening to the jury, he detailed certain inculpatory admissions about the killing which Driver was said to have made to his mother-in-law, Mattie Lee Scott. The jury was told that her statement with respect to the admissions had been recorded on tape by the police and that later the recording was run for the defendant to hear. Then, according to the opening, when Driver disputed their truthfulness, he was asked to "clear this up. Take a lie detector test, and he refused." The Assistant Prosecutor pursued the matter further, saying that as various portions of the tape were played for Driver the request for such a test was repeated and "every time he refused."

No objection was made by defense counsel but we regard the references as so highly improper as to constitute plain error. The State's case against Driver was based upon circumstantial evidence to a substantial degree and alleged oral admissions by him. In such a case particularly, to tell a jury of laymen at the very outset of the trial that defendant

refused a number of times to take a lie detector test was to create a probable aura of prejudice which would permeate the proceeding to the very end.

 The results of polygraph tests, whether favorable or unfavorable to an accused, are uniformly held inadmissible. We are aware of no jurisdiction which holds to the contrary, and none has been cited by the State. Basically, the reason for rejection is that the lie detector has not yet attained scientific acceptance as a reliable and accurate means of ascertaining truth or deception. *State v. Walker,* 37 *N. J.* 208, 214, 216 (1962); *State v. Arnwine,* 67 *N. J. Super.* 483 (*App. Div.* 1961); *State v. Varos,* 69 *N. M.* 19, 363 *P. 2d* 629 (*Sup. Ct.* 1961); *State v. Trimble,* 68 *N. M.* 406, 362 *P. 2d* 788 (1961); *Mattox v. State,* 240 *Miss.* 544, 128 *So. 2d* 368 (*Sup. Ct.* 1961); *State v. Foye,* 254 *N. C.* 704, 120 *S. E. 2d* 169 (*Sup. Ct.* 1961); *People v. Aragon,* 154 *Cal. App. 2d* 646, 316 *P. 2d* 370 (*S. Ct. App.* 1957); *People v. Wochnick,* 98 *Cal. App. 2d* 124, 219 *P. 2d* 70 (*D. Ct. App.* 1950); Annot. 23 *A. L. R. 2d* 1306; 1960 *A. L. R. 2d Suppl. Service* 1998; 1962 *A. L. R. 2d Suppl. Service* 580; compare *State v. Levitt,* 36 *N. J.* 266, 275 (1961).

If the results of polygraph examinations are not competent evidence, *a fortiori,* refusal by a defendant in a criminal case to submit to one cannot be made the subject of testimony. In terms of degree of prejudice, the average jury, unfamiliar with the present scientific uncertainty of the test, might very well be even more affected by proof of a defendant's refusal to take the test than by the evidence of results adverse to him coupled with proof of its scientific imperfection. A refusal might be regarded as indicating a consciousness of guilt—undoubtedly the reason here why the Assistant Prosecutor placed such emphasis upon it in his opening. Moreover, his remarks were calculated to prejudice the jury by implying that the mechanical device was the ultimate in tests for the truth.

In *State v. Kolander,* 236 *Minn.* 209, 52 *N. W. 2d* 458, 465 *(Sup. Ct.* 1952)*,* evidence of the defendant's unwillingness to take the test was admitted but with a cautionary instruction that no adverse inference was to be drawn therefrom. The Supreme Court reversed with quotable pertinence to the present case:

"The state concedes that the results of a lie-detector test would not be admissible, but contends that it may nevertheless be shown that defendant refused to take such test, since such refusal is evidence of a consciousness of guilt similar to evidence of flight. With this we cannot agree. Much the same proposition was advanced in *People v. Wochnick,* 98 *Cal. App. 2d* 124, 219 *P. 2d* 70, *supra.* In that case, an officer testified that defendant had been told that he had been placed on the lie detector for a test and that there was a violent reaction when he was shown a certain exhibit; and that when he was asked for an explanation of such reaction he stated that he could not explain it. The trial court instructed the jury that it could not consider that portion of the conversation relating to the lie-detector test as indicating whether or not there was any reaction to any technical test. In holding that it was reversible error to admit the evidence, the California court said * * *: 'Despite the instruction of the court, the evidence of the partial results of the lie detector test with respect to defendant's reaction upon being shown the murder weapon was indelibly implanted in the minds of the jurors and could not but have had a prejudicial effect.'

The same is true here. * * * The impact upon the minds of the jurors of a refusal to submit to something which they might well assume would effectively determine guilt or innocence, under these conditions, might well be more devastating than a disclosure of the results of such test, if given after a proper foundation had been laid showing how the apparatus functioned."

See also, *Mills v. People,* 139 *Colo.* 397, 339 *P. 2d* 998 *(Sup. Ct.* 1959)*;* *Commonwealth v. Saunders,* 386 *Pa.* 149, 125 *A. 2d* 442, 445 *(Sup. Ct.* 1956)*;* *People v. Aragon,* *supra,* 316 *P. 2d,* at *p.* 379; *State v. Foye, supra,* 120 *S. E. 2d,* at *pp.* 172, 173.

Under the circumstances, we regard the remarks in the opening concerning the lie detector test as possessing such horrendous capacity for prejudice against the defendant as to constitute plain error. *Mattox v. State, supra,* 128 *So. 2d,* at *p.* 373; *State v. Varos, supra,* 363 *P. 2d,* at *p.* 631;

*Mills v. People, supra,* 339 *P. 2d,* at *pp.* 999, 1000; and see, *State v. Corby,* 28 *N. J.* 106, 108 (1958).

The shadow cast by the improper opening remarks deepened during the course of the trial. The Prosecutor had told the jury that the tape recording of Driver's mother-in-law's statement was played to him in sections. At the completion of an inculpatory admission attributed to him, he would be interrogated about it and, on his denial thereof, he would be asked to take a lie detector test on the subject. When he refused, the next portion of the recording was released and the same performance followed. The exact number of times that happened until the end of the tape was reached does not appear. The clear impression from the Prosecutor's remarks is that there were several such instances. He said "they played various portions" of the tape and "every time" defendant refused the polygraph test. Thus the jury was alerted for what the prosecution had planned to prove in connection with the mother-in-law's recorded statement.

When the State was endeavoring to introduce Driver's unsigned confessions in evidence, a separate hearing, out of the presence of the jury, was held to consider their voluntariness. In the course of the testimony of the police officers, there were many references to the refusal to submit to a lie detector test, particularly while the mother-in-law's recording was being discussed. Ultimately, the trial judge informed the Prosecutor that if the unsigned statements were found to be voluntary and it therefore became necessary to repeat the evidence on that aspect of the case for the jury, it would be improper to refer to or attempt to prove defendant's refusal of the lie detector test. Later, following the court's decision to admit the statements, and the jury's return to the court room, the State did not attempt specifically to offer the banned testimony. But the manner of presenting the playing of the various portions of the mother-in-law's recording and Driver's attitude toward them during the police interrogation made the air

pregnant with the Prosecutor's opening remarks about the lie detector test. For example, when Lieutenant James F. Keegan was describing Driver's conduct while listening to the various portions of the recording, he explained that upon playing a part of the tape containing an alleged admission, Driver would deny the statement attributed to him by his mother-in-law, "and the captain [who was participating in the interrogation] then asked him *this question that I'm not supposed to say."* And (by the Assistant Prosecutor) :

"Q. Then again this question was asked and again Driver gave an answer, and then there was a conversation about that question and answer?

A. Yes, sir, that same proceeding after each part of the recording took place."

Again, a little later in the examination concerning the recording :

"* * * but we saw him again a little after 8:00 o'clock and went into this subject I am not supposed to mention * * *."

Comment of the same type was made by Captain John Bojarski in giving his testimony. To a lesser extent it ran through that of Sergeant Frederick M. Porter, Jr., also. Both of these officers took part in the extended interrogation of Driver. And the Prosecutor's numerous references to the question and answer which could not be mentioned served to keep the matter in the consciousness of everyone. (All of these improprieties and insinuations can and should be avoided by pretrial preparation. See *People v. Aragon, supra,* 316 *P. 2d,* at *pages* 378, 379.) Moreover, John J. Toth, a State Police officer, was produced by the State, and an effort was made to show that his purpose in appearing at a June 1958 interrogation of Driver was in connection with a lie detector test. The attempt (which came after the court had ruled earlier in the trial that such a test was inadmissible) was frustrated after a side bar

conference. Even after that took place, the Assistant Prosecutor went on to prove that Toth's appearance there was not for the purpose of interrogating anyone. Then, in summation, he said:

"* * * Toth wasn't even there for the purpose of questioning this man or of interrogating him. He was aiding Latowiec, and because of the defense motion I can't tell you why Latowiec was there and Toth was there. They were participating in no way in any questioning of the defendant and he was in observing, observing for what I can't say."

Finally, on this subject, another matter must be mentioned. A recording was made of a September 8, 1959 interrogation of Driver. It was admitted in evidence over objection and the jury allowed to hear it. The police officers prepared what they said was a transcript of the tape and produced it at the trial. It was not admitted in evidence, although handed to the trial judge for use in connection with his private audition. Following argument of the appeal in this Court, the tape was run for us and the transcript (which was included with the State's exhibits) was made available to us. A specific reference appears therein to Driver's refusal to take a polygraph test. Although the audibility of the recording will be treated hereafter, it is sufficient to say at this time that the question and answer relating to the test were not audible to us. We cannot say if the trial court heard them. Presumably he did not, because he had already declared such evidence incompetent, and therefore we must assume that he would have had that portion of the tape eliminated before allowing the jury to hear it. But if the reference to the test is on the tape, as the police assert, we cannot say the jury or some of its members did not hear it.

The entire handling of the lie detector test aspect of the case clearly reveals prejudicial overzealousness on the part of the prosecution, and leaves an appellate court with no recourse but vacation of the conviction. As the court said

in *Mills v. People, supra,* speaking of the State's introduction in evidence of defendant's refusal to take a lie detector test:

"All too frequently this court is compelled to reverse judgments of guilt in important criminal cases because of over-zealous prosecution. It is the duty of prosecuting officers to guard against the introduction of incompetent evidence. Over-prosecution of the accused should not be permitted by the trial court. In the instant case the district attorney insisted at great length upon introduction into evidence of testimony which is uniformly held to be incompetent, in an unbroken line of authorities throughout the nation. * * *." 339 *P. 2d,* at *pp.* 999, 1000.

## II.

### VOLUNTARINESS OF THE UNSIGNED CONFESSIONS.

Two memorandums made by Lieutenant Keegan, purporting to record conversations previously held with Driver, were admitted in evidence. Keegan said he wrote them immediately after leaving Driver and read them to him at the next period of questioning, at which time Driver acknowledged the factual recital to be correct. He would not sign them, however, or consent to the preparation of a separate statement containing the same material. The trial court treated the memorandums as competent, unsigned confessions within the intendment of *State v. Cleveland,* 6 *N. J.* 316, 329 (1951), and after making the preliminary finding (called for by *State v. Smith,* 32 *N. J.* 501 (1960), *cert.* den. 364 *U. S.* 936, 81 *S. Ct.* 383, 5 *L. Ed. 2d* 367 (1961)) that they were voluntary, he ordered them marked in evidence. Consideration of the propriety of his ruling requires a study of the circumstances under which they were given.

The crime was committed on April 4, 1958. On June 23, 1958, Driver was taken by police officers from his place of employment to the Hamilton Township police headquarters. No complaint had been made against him and they had no warrant for his arrest. He was brought in for interrogation because the officers believed he was involved in the Mayer

murder. Questioning began around 2 P. M. and was engaged in by Chief Booz, Captain Bojarski, Lieutenant Keegan, Detectives Paterra, Girard, Latowiec, Berrisford, Toth and Dorsey (a relative of Driver's). They were experienced officers and the questioning was done in relays (except perhaps for Latowiec and Toth, whose function was to prepare Driver for a lie detector test) until about 8 P. M., when the officers departed for dinner. They returned at midnight and continued the inquiries until 2:30 A. M. They desisted then until 2:30 the following afternoon when they resumed until 4:30 P. M. After a half-hour break, the questioning pressed on to 8 P. M., when the officers recessed for dinner. They came back at 9:30 P. M. and pursued the inquiry until 2:00 A. M. The next morning interrogation began at 8 A. M., and was engaged in by relays of officers for three hours. The questioning related to the murder and to Driver's income and expenditures before and shortly after that time. He asserted that he was struck during its course by Detectives Girard and Toth, Girard particularly striking him in the right side of his jaw. Girard was not called as a witness to deny the charge, although Toth said he saw no violence toward Driver while he was present.

The police released Driver around 1 P. M., approximately 48 hours after his arrest, minus his belt and shoestrings. His sister, Thelma Mills, described him at that time as tired and nervous; his eyes were swollen and white, and he was complaining about his jaw. There is testimony to the effect that the pain and difficulty in his jaw continued and about 19 days after the release he visited a doctor for treatment.

At the trial, on cross-examination of Driver it appeared that Dr. Joseph F. Fiorello treated him for the jaw condition. The Assistant Prosecutor then asked Driver:

"Are you going to subpoena him in here?"

An objection was interposed and without waiting for a ruling or an answer, the examiner said:

"If you are not, we will."

On the next day, as the examination continued, defendant said he told the doctor the injury was caused by a blow. He was asked if he was sure and replied in the affirmative, whereupon the following occurred:

"Mr. Barry: Mr. Meredith may smile, but I think the doctor's testimony will be most revealing and might wipe that smile off his face."

The State called Dr. Fiorello in rebuttal and on direct examination he testified that Driver had come in complaining of his jaw. Examination revealed a "lump on his right temporal mandibular area." There was no history of a blow, and the treatment given was an "injection of penicillin for a possible infection." On further direct questioning, the doctor revealed that he had discussed the matter with defense counsel before trial. Then he was asked if he had given them substantially the same information as he had now given the jury. An objection was interposed, to which the Assistant Prosecutor said:

"Mr. Moore got up in his opening and said he was going to produce a doctor who treated this man for a blow and that blow was administered by Tony Girard. That's a direct slander and they did it intentionally and knowingly, and Mr. Meredith may laugh but it is no laughing matter to me."

On cross-examination, it developed that the doctor had been subpoenaed by the defense. If he was to be used as a witness it seems likely that it would have been subsequent to the completion of Driver's testimony. He was not called in, however, and defense counsel in summation, anticipating the State's comment, suggested that the failure to put the doctor on the stand was a matter of trial tactics. In any event, on cross-examination the doctor said he found a painful swelling of the hinge of the mandible and the skull.

He could remember nothing about the history of the case beyond the notations he had made at the time on his treatment card, which he admitted having shown to defense counsel when they visited him. That card, which he handed to counsel on request as the cross-examination proceeded, contained the notation "trauma rt. mandible" followed by a question mark. And he conceded that the notes were written as the result of what Driver told him. At another place thereon under "Remarks" he had written: "Fracture rt. mandible?." Below that there was an additional notation, which does not look like the same pen or handwriting: "Teeth—X-ray of mandible—To dentist." On redirect examination by the State he was asked about that writing and he said it indicated his feeling that Driver's condition "was possibly due to a tooth" and that he should have an X-ray by a dentist. When Driver was recalled in surrebuttal, it appeared that he had had no teeth in the upper part of his mouth since 1951 or 1952 and had used a plate (which he removed to show the jury). The defense offered the card in evidence. After first objecting to it the State withdrew the objection, whereupon the trial judge said it was not necessary and rejected it. After some further questioning, the offer was repeated and the State again said there was no objection. Then the court said: "All right you may have it, there is no objection."

Particular reference is made to the card because of the retrial to follow. The card is manifestly admissible to attack the doctor's credibility. It has substantial value to that end. Moreover, in this connection, it seems advisable to point out that the Assistant Prosecutor's comments, which we have quoted above, were improper and we assume will not be repeated.

After being released on June 25, 1958, Driver was not kept under close police surveillance. But the police "kept track of him." The investigation of the case continued and they "knew where he was if [they] needed him." Driver testified that during the ensuing period and prior to July 11,

1959, he and members of his family received letters and phone calls about the case, suggesting that he give himself up, telling him to "Beware of Good Friday," etc. On one occasion, someone handed his son a picture of Mayer. There is no suggestion that the authorities were in any way responsible for that conduct.

In January 1959, while working as a carpenter on a project in south Jersey, Driver was arrested by a State Trooper and brought to the Bordentown barracks for questioning about a bank robbery. A representative of the bank came there, looked at him and told the police he was not the robber. He was not released, however. Instead, Detectives Girard and Paterra, who had participated in the June 1958 interrogation in the Mayer case, appeared and again questioned him about it from 1:00 to 7:00 P. M. Then he was released.

There was no further contact with the authorities until Driver had an altercation with his wife and mother-in-law at home. They made assault and battery complaints against him in Ewing Township, as a result of which the local Magistrate, on July 11, 1959, sentenced him to six months in the County Workhouse. At the time of sentencing, according to Driver, the Magistrate suggested that if he decided to behave himself he should write him to that effect and an early release would be considered. There is testimony that Captain Bojarski read of the jail sentence in the newspapers.

On July 15, 1959, according to Driver's mother-in-law, Mrs. Scott, police officers came to see her and brought her down to the Hamilton Township police headquarters. There, she gave a statement that sometime in December 1958, more than six months earlier, she had accompanied Driver to Verdel's Bar, a local tavern frequented by him. While drinking, she said he talked about the Mayer murder. He started to cry and said: "We did it, I did it, I did it. * * * We went to A & P store. * * * We taken him and we paste his mouth. We throwed him into the

river or ocean" (she could not remember which he said). In her later testimony at the trial she said also that thereafter at home, on occasions, he would say: "I did it but they got to prove it." At some time later her statement was recorded on tape.

Armed with this information, the officers decided to question Driver again. According to the opening of the State to the jury, the questioning was planned carefully and "there was a course and a strategy [which] commenced on August 3." It was decided to allow Driver to "settle down" for two weeks in the Workhouse. At first he was given an outside work assignment; then it was withdrawn and he was put to work in the kitchen. The warden said this was done because there was a detainer outstanding for him on another charge. When it appeared that this was not the case, he opined that the change probably occurred because of Driver's previous criminal record.

On August 3 at 9:45 A. M., Driver was brought into the warden's office for the beginning of what eventuated in an intensive and prolonged interrogation. On the 3rd, the questioners were Captain Bojarski, Lieutenant Keegan and Sergeant Porter. They began by discussing "routine topics" to put him at ease, "his family, his children and his wife." Then they moved to questions about expenditures made by him within a short time after the murder. They produced an itemization of expenditures and what they believed to have been his earnings between January 1 and the end of October 1958. It may be noted that the total earnings shown (although not added on the tabulation used in the questioning) exceeded the expenditures listed (but also not added). It seems obvious also from the testimony adduced at the trial that Driver's earnings were greater than those listed, but also his ordinary living expenses and expenditures were greater than those used by the officers. It does appear, however, that three days after the robbery he bought a 1949 Buick sedan for $200 in cash, and during the month of April he paid $225 in back rent. In May he made a

down payment of $1,000 on the purchase of a home, as well as paying $125 on delinquent rent. In June he bought and paid $430 for a 1952 Mercury, and made another payment of $75 on delinquent rent. In any event, the questioning persisted throughout the day (with a pause for lunch, and at another time for a soft drink) as to his expenditures and where he obtained the money and whether it was part of the proceeds of the A & P robbery. The officers desisted sometime after 4 p. m. During the day, he said, they told him they would keep returning until he explained the expenditures or his part in the murder.

The Workhouse staff kept daily records of the questioning periods. The guard on duty at the center noted the time when Driver passed that point each day on the way to the office of the warden (who did not participate in the proceedings) for the sessions with the detectives, and he entered the time Driver repassed the center after completion of the sessions. It took about a minute to cover the distance from the center to the warden's office. On August 3 the log shows Bojarski, Keegan and Porter visited Driver from 9:45 a. m. to 4:40 p. m.

During the lunch period, although Driver was permitted to eat in the dining room provided for all inmates, beginning on this day he was separated from them by some distance with a guard at his side. Moreover, as of August 3 his sleeping quarters were changed. He no longer shared the inmates' common room. He was shifted to the infirmary where he remained at least for the next week or 10 days. There were two or three inmates in the infirmary on August 3; they were removed, and Driver became its solitary occupant. This was done for his "protection," according to the officers.

On August 4, the same officers reappeared at 9:45 a. m. They told him again they were going to keep coming. On being asked as to the nature of the questioning, he said: "The same thing, always expenditures, expenditures" and his part in the murder. They kept "hounding" him about

expenditures, but refused to accept any explanation; they insisted he was not working when he said he was. He said the same performance went on day after day, and he thought if the June 1958 Hamilton Township examination was going to be repeated, he couldn't "endure six months of that." Except for the lunch period, the questioning continued all afternoon, the log showing his return to the center at 5:30 P. M.

On Wednesday, August 5, Keegan and Porter returned, at 10 A. M. (the log shows), and the questioning continued. On this day he claims he asked for an attorney and was told "You are confined here. You are not permitted to have a lawyer." In their testimony Keegan and Porter denied the request was made. He told them about the Magistrate's indication of possible early release on the assault and battery sentence. They said only the Prosecutor could release him. They remained with him all day, except for the lunch period. He was returned to the center at 5:30 P. M. On this day or the next he "smuggled out" a letter to his sister, Thelma Mills, about an attorney, asking her to consult Legal Aid.

Driver asserted that about the third day of questioning he asked the warden how long it was going to go on and the warden replied there was nothing he could do about it; when the detectives wanted Driver, it was necessary to produce him.

On August 6, Chief Campbell, Bojarski, Keegan and Porter appeared and the log notes that Driver passed the center on the way to the warden's office at 10:20 A. M. They subjected him to interrogation throughout the day, except for the lunch period and (they said) breaks for a soft drink, until 4:35 P. M. During the morning he was asked if he ever admitted to anyone his participation in the murder. He denied having done so and after lunch they produced and allowed him to hear the recording of his mother-in-law's statement. The officers testified that he denied it but ap-

peared stunned. He testified they called him a liar and said the statement would convict him.

On August 7, Keegan and Porter returned at 10:15 A. M. They went through the "same thing, over and over," and they told him he would be indicted and they would "put it all on him." The record shows the questioning ended about 9 P. M., with time out for meals.

Keegan and Porter reappeared prior to 9 A. M. on August 8. Driver passed through the center at 9 A. M. The interrogation covered the same and some new ground. According to Driver, they began to urge him to turn State's evidence, pointing out that by doing so he could escape the death penalty, and if he cooperated leniency in sentence would be recommended. It was suggested that he might get as little as 20 years, and perhaps be paroled in seven years.

They talked to him about his brother-in-law, David Mills, whom they believed to be the principal actor in the robbery. Mills had deserted Driver's sister and had gone to California. They had heard that Mills had given him a "shellacking" before he left New Jersey. And they asked him if he would talk to his sister about becoming a witness for the State in the murder. He agreed, he said, "to get them off me." The officers left shortly before 5:30 P. M. and he was returned to the infirmary.

Driver was not questioned on August 9. Keegan and Porter returned about 6 P. M. on August 10, and again began to persuade him to cooperate with the State. They allowed him to talk to his sister at about 7 P. M. She informed him Legal Aid would not provide a lawyer and that she had no funds. She told him that the Prosecutor wanted him "to turn State's evidence, that he knew that Mills was the one that committed the crime, and they wanted him to say so, and that if he did, they would try to help him and give him time instead of the electric chair." She said also that Mr. Barry wanted defendant to name the person who "performed the crime, that he knew it wasn't Reginald, but

knew that Reginald knew who did it, and for him just to tell who did." Mrs. Mills and Driver discussed the problem and she told him to tell the truth but not to admit participation if it were not true. Later, Assistant Prosecutor Barry appeared. According to Driver, Mr. Barry said he had heard the Scott recording and that Driver ought to turn State's evidence; he would have to cooperate or take the consequences. Then he told Driver that if he admitted his part in the robbery and cooperated, Barry would see to it that he would not get the electric chair. Instead, he would recommend leniency to the court which would probably result in a 20-year sentence. The State's version of this conversation at the trial was that Mr. Barry said that if he gave a full, signed confession about everything he knew concerning the crime, testified before the Grand Jury and at any later trial of the other participants, he would be allowed to plead *non vult* to a murder charge. This would "erase" the death penalty and the State would recommend leniency which would mean a possible 20-year sentence. Driver refused the offer and Mr. Barry replied that he would see him in court. Just before leaving he said David Mills had been returned from California, and Driver was not to be naive enough to think that the extradition was just for a desertion charge.

Keegan and Porter remained after Mr. Barry left. It was then between 8 and 9 P. M. They said Driver seemed stunned at the news of Mills' return, and an intensive questioning began which lasted throughout the night. Defendant was returned at the Workhouse center at 5:30 A. M.

The detectives told him that he was foolish not to go along with them; he did not have a chance with the evidence they had against him, including his mother-in-law's statement and recording. They said he was protecting Mills; that Mills was going to be indicted for murder. (No complaint has ever been made or an indictment returned against Mills for this crime.) Discussion arose about the criminal responsibility of persons who have some con-

nection with a robbery-murder. Driver was told about the equal liability of aiders and abettors. According to Keegan, he said: "You mean to tell me just because you can prove against me that I got some money from that Mayer hold-up and robbery job that I can be charged with murder." Keegan then procured the annotated statutes and read various sections and notes of cases to demonstrate that all who participate in a robbery-murder are principals and are guilty of first degree murder. "Supposing" situations arose. Keegan gave an example: "If four men or more are in a car and one is in possession of a weapon and they happen to be apprehended, all of them can be charged with the crime of concealed weapon." Driver testified that during the interrogation he said: "Suppose a man is in a bar by himself and someone calls for him to go with them and he goes with them and then after the trip he finds out that a crime has been committed, what would he be charged with?" Keegan said the person would be a principal and, as the questioning was pressed, the detectives insisted that he was speaking of himself. Although the precise form of the "suppose" inquiry is in dispute, Keegan asserting that it contained a reference to a "heist job," it is plain that throughout the night Keegan and Porter sought an admission that he was the person at the bar. Driver asserted that they "kept pounding" at him until morning. He described the session "and at this time, well, they keep driving questions at you, they pounded them in and you get so you don't know who's asking what or what's being asked. All you know it just goes on and on. And I found it's just easy to go along with them, I couldn't fight them no more."

Keegan testified that after the night session of August 10 he made handwritten notes of the conversation. The notes were subsequently admitted in evidence at the trial as Driver's unsigned confession.

Keegan, Porter and Lieutenant Coate, of the Hamilton Township police, visited Driver the next evening, August 11.

Driver was taken to the warden's office for questioning around 6:45 P. M. Keegan produced the notes of the August 10 meeting and went over them with him. Their inculpatory nature was plain. Driver testified that he denied having made the statements; that they were Keegan's story, not his. But they insisted it was the version he had given of his participation in the crime. The questioning again went on until early morning. They just kept "driving" at him "all the time." He was returned to the center at 3 A. M.

During the night the officers brought out maps of the Carnegie Lake area and the streets leading to it, and went over them with him. At the trial, he insisted he had no knowledge of the names of some of the streets which later appeared in his statement, until Detective Porter pointed them out to him on the maps. They showed him pictures of Mayer's body taken after it was removed from the water, with the adhesive tape still in place. (A few days thereafter they said he would not have a chance when the pictures were blown up and given to a jury.) He was advised repeatedly that it was foolish not to give a full, signed statement; they knew Mills was the principal culprit and he an accomplice, and unless he yielded all the blame would be put on him. But he refused to sign a confession.

The detectives dispute Driver about the pressure and about the contents of Keegan's notes. They say Keegan's memorandum, except for some inconsequential detail, represents defendant's actual admissions, and that when they went over it with him he not only conceded its truth but elaborated upon it during the night and morning of August 11–12. Keegan testified that after leaving Driver in the early morning of August 12, he again made notes in longhand of the conference. Keegan and Porter returned about 8 P. M. with Keegan's report. It was shown to Driver and the officers say he admitted the truth of the contents (as the result of which it was also received in evidence). The interrogation went on, however, until 12:40 A. M.

Before the meeting in the warden's office, unknown to Driver, a tape recorder. had been set up there. It was testified, however, that the recording proved inaudible. Describing the questioning on this night, Driver said it was "always the same thing; go over, go over and I * * * got tired of fighting with them." They "keep pounding these questions at you, everything you say they have no regard for at all. And I know it was hopeless. My sister couldn't get me help, so there was nothing to do but go along with them."

The two unsigned confessions in substance say that about a week and a half, or two weeks, prior to the murder Driver was asked if he wanted to make "some big dough" on a "heist job." He agreed to participate but was not told where it was to take place or the identity of the victim. He was told to keep his mouth shut, be at the Ewing Tavern on Good Friday night and wait until this unnamed person came in and gave him the signal. When that happened, he was to get into a car, which would be parked outside, follow another car, and pick up its occupants later. On the night of the robbery he went to the Tavern and waited there. The "number 1" man (whom he never identified) came in and told him to come along. Outside he was told to get into a parked car and follow the car being driven by "number 1." Driver did so. He noticed another person sitting in the car ahead but could not see his face. When they reached Harrison Street in the vicinity of Carnegie Lake, the lead car stopped; "number 1" came back to Driver and told him to drive up and down Harrison Street until he and the other occupant (described as "number 3") came back. He was instructed also to keep on going if he saw any police cars. He did so, and while driving· up and down he saw a "poof" of flame from the direction in which the two men had gone. Thereafter, the two men returned to the road, "number 1" joined him in the front seat, and "number 3" got in the back. A short time later, he stopped to let "number 3" out. Driver had no conversation with

that person nor could he identify him. The "number 1" man then drove Driver home.

On the morning of April 5 the "number 1" man returned to Driver's home and handed him about $470. Several days later, the same person gave him $1,500 additional, and still later, a few hundred more. In all, he received about $2,200.

The interrogation did not end with the two inculpatory memorandums. Nor was a formal murder complaint made then or indictment procured. Driver's six months' term in the Workhouse on the assault and battery conviction would not expire, even with work and good behavior credits until sometime in December. So the officers continued to press him for a signed confession, identifying the companions named in the statements. But he never did so. He said they went over and over the same ground, particularly Keegan's memorandums, until he was discharged from the Workhouse on December 11, 1959, and transferred to the County Jail. Further repetition of the nature of the questioning after August 12 seems unnecessary. The following is a list of the detectives' visits as shown on the Workhouse log:

| 8/13/59 | Porter and Keegan | 9:00 P. M. — 1:45 A. M. |
| 8/14/59 | Porter and Keegan | 3:15 P. M. — 8:00 P. M. |
| 8/15/59 | Porter | 3:40 P. M. — 7:30 P. M. |
| 8/16/59 | Porter | 4:15 P. M. — 8:30 P. M. |
| 8/17/59 | Porter | 12:45 P. M. — 6:50 P. M. |
| 8/18/59 | Porter and Keegan | 1:15 P. M. — ? |
| 8/20/59 | Porter and Keegan | 12:50 P. M. — 5:00 P. M. |
| 8/21/59 | Porter and Keegan | 1:15 P. M. — 6:00 P. M. |
| 9/ 2/59 | Porter and Keegan | 12:50 P. M. — 8:00 P. M. |
| 9/ 3/59 | Porter and Keegan | 1:40 P. M. — ? |
| 9/ 8/59 | Porter and Keegan | 12:40 P. M. — 3:40 P. M. |
| 9/18/59 | Porter | 1:00 P. M. — 4:30 P. M. |
| 9/22/59 | Porter | 1:00 P. M. — 5:15 P. M. |
| 9/24/59 | Porter | 12:45 P. M. — 4:45 P. M. |
| 9/28/59 | Porter | 1:00 P. M. — 2:20 P. M. |
| 10/13/59 | Porter and Keegan | 1:10 P. M. — 5:00 P. M |
| 10/14/59 | Porter | 1:10 P. M. — 2:05 P. M. |
| 11/25/59 | Porter and Keegan | 1:10 P. M. — 5:00 P. M. |

During August and until September 8, 1959, four further efforts were made, without Driver's knowledge, to obtain

tape recordings of the questioning about the unsigned confessions. One was made on September 8 and, some of it being audible, it was introduced in evidence over defendant's objection, and the jury was allowed to hear it.

It is worthy of note that the warden, who had been in charge of the Workhouse for six years, testified that he had never before experienced such a prolonged interrogation of a prisoner. Two or three visits had been the maximum.

In spite of the unsigned confessions of August 11 and 12, no complaint for murder was filed until Friday, December 11, 1959. On that day Driver was brought before the local Magistrate for a preliminary arraignment. On being asked if he wished an attorney and replying in the affirmative, the Magistrate communicated with a County Judge at his home. It appeared that the list of attorneys available for assignment was at the courthouse, and therefore the arraignment would have to be postponed until Monday. On learning this, in order to get out of the Workhouse and into another place of detention, Driver entered a not guilty plea to the complaint. The indictment was returned on December 15, 1959, and he pleaded not guilty to it in the County Court on January 22, 1960, still without counsel. The two defense attorneys were not assigned until May 13 and 25, 1960.

After all the evidence about the giving of the statements had been produced, the trial court made a preliminary finding that the oral confessions and the two Keegan memorandums, which he treated as unsigned confessions, had been made voluntarily by the defendant and were therefore admissible. He held that the prolonged and relentless questioning was not responsible for the admissions of participation in the crime. In his view, defendant's yielding was stimulated or triggered by the information given to him by the Assistant Prosecutor and the detectives on August 10 that Mills had been brought back from California and would be charged with the Mayer murder.

This court has had two occasions within the last two years to consider the problem of competency of confessions.

In *State v. Smith,* 32 *N. J.* 501, *supra,* Justice Hall reviewed exhaustively the development of the law of New Jersey on the subject and the controlling influence recent United States Supreme Court decisions have had in moulding the law. In *State v. Fauntleroy,* 36 *N. J.* 379 (1962), the court, in an opinion by Justice Jacobs, revisited the scene, with further emphasis on the impact of Federal cases on the duty of state courts to reject involuntary confessions, and ordered a new trial because the record on appeal did not support the conclusion that the confession was the product of the free and uncoerced will of the defendant.

Justice Hall pointed out in *Smith* that originally in New Jersey voluntariness of inculpatory admissions was tested by presence or absence of threats or violence to the accused, or direct or implied promises to him of reward or benefit. But that concept has now been expanded as the result of opinions of the United States Supreme Court to include persistent and protracted interrogation, mental and psychological duress and similar factors. 32 *N. J.,* at *page* 542. And of more basic importance, the right of a defendant to exclusion of an involuntary confession, as thus defined, has been given recognition by that tribunal as a constitutional right within the broad sweep of the Fourteenth Amendment of the *Federal Constitution.* As Chief Justice Warren wrote in *Blackburn v. State of Alabama,* 361 *U. S.* 199, 206–207, 80 *S. Ct.* 274, 4 *L. Ed.* 2d 242, 248 (1960), quoted in *State v. Smith, supra,* 32 *N. J.,* at *p.* 543, and warranting repetition here:

"It is also established that the Fourteenth Amendment forbids 'fundamental unfairness in the use of evidence whether true or false.' * * * Consequently, we have rejected the argument that introduction of an involuntary confession is immaterial where other evidence establishes guilt or corroborates the confession. * * * As important as it is that persons who have committed crimes be convicted, there are considerations which transcend the question of guilt or innocence. Thus, in cases involving involuntary confessions, this Court enforces the strongly felt attitude of our society that important human values are sacrificed where an agency

of the government, in the course of securing a conviction, wrings a confession out of an accused against his will. This insistence upon putting the government to the task of proving guilt by means other than inquisition was engendered by historical abuses which are quite familiar."

The decision in *Blackburn,* as well as others of that court referred to in our opinions in *Smith* and *Fauntleroy,* imposes a mandatory burden on all courts to test the admissibility of confessions not only by the ordinary rules of evidence but by the deeper constitutional requirement of fundamental fairness. *State v. Smith, supra,* at *p.* 544. Production of the necessary evidence to satisfy that burden rests with the State and evaluation of the evidence in the first instance is the clear duty of the trial court. The obligation of the judge, as noted in *Smith,* is not satisfied by lip service. He is not at liberty to shift to the shoulders of the jury his own responsibility. Such action undermines the integrity of the administration of justice. Moreover, appellate review of the issue of voluntariness, as exemplified by the thorough analysis of the evidence in such cases by the United States Supreme Court, must be searching and critical.

Our study of the proof in this case, in the light of the strictures mentioned, satisfies us that defendant's alleged oral confessions to the police, the unsigned statements and the tape recording, were not the product of "an essentially free and unconstrained choice." See *Culombe v. Connecticut,* 367 *U. S.* 568, 602, 81 *S. Ct.* 1860, 6 *L. Ed. 2d* 1037, 1057 (1961). The greater weight of the evidence indicates that they were "suctioned" out of the defendant by relentless and prolonged interrogation, and undoubtedly influenced in some measure by promises of leniency and of elimination of the death penalty. See as to the latter: *Bram v. United States,* 168 *U. S.* 532, 18 *S. Ct.* 183, 42 *L. Ed.* 568, 570 (1897); *The State v. Guild,* 10 *N. J. L.* 163 (*Sup. Ct.* 1828); *Roesel v. State,* 62 *N. J. L.* 216 (*E. & A.* 1898).

When the police discovered around July 15, 1959, that

Driver had been sentenced to six months in the Workhouse on an assault and battery conviction, they knew he had been subjected to intensive questioning about the murder for two days in June 1958, and for about six hours in January 1959, without any inculpatory admission having been drawn from him. Now he was available to them for six months; it was no longer necessary to hold him as a suspect for investigation and release him after 48 hours if interrogation proved unproductive. So as the Assistant Prosecutor said in his opening, they carefully planned their questioning and their strategy.

Execution of the plan began at 9:45 on August 3, 1959, when Driver passed the Workhouse center on the way to the warden's office. For the next week or 10 days at least he slept in isolation in the infirmary, its other occupants having been removed so that he would be alone. He had breakfast and dinner alone in the hospital. At lunch he would be taken to the same mess hall as the jail inmates, but he sat apart from them with a guard next to him. Using the daily Workhouse records as a base, and they must be given credence, the fair indication is that from 9:45 A. M. on August 3 until 12:30 A. M. on August 12 Driver was confined to the interrogation room with detectives for roughly 60 hours. There were occasional pauses for a soft drink, and during the evening of August 10 about one-half hour was devoted to sandwiches. The reference is to August 12 because at the end of the questioning at 12:30 A. M. on that day, the State had completed the two unsigned confessions that were later received in evidence. Thereafter, from 9 P. M. on August 13 until September 8, when the allegedly corroboratory tape recording was obtained, it may be estimated from the record that approximately 40 additional hours (excluding August 18 and September 3, when the guard overlooked noting the time of Driver's return to the center) were spent by the detectives with Driver, going over the unsigned statements, endeavoring to persuade him to turn State's witness,

and attempting surreptitiously to secure an acceptable tape recording.

Under the circumstances present, we regard the intensive interrogation between August 3 and 12 as inherently coercive and the resulting two confessions therefore invalid. We are aware of no case, certainly in recent years, and the State has furnished none, where a confession was regarded as acceptable after so many successive hours and days of questioning. The periods of examination in a number of the landmark Federal cases were reviewed in *State v. Fauntleroy, supra,* 36 *N. J.,* at *pp.* 388–391; and see, *Malinski v. New York,* 324 *U. S.* 401, 65 *S. Ct.* 781, 89 *L. Ed.* 1029 (1945). No instance compares with this one, either for length or intensiveness of police questioning. The warden of the Workhouse probably expressed the common experience when he avowed never knowing of such a protracted inquisition. Driver was a captive of the detectives in every sense of the word. He was serving a sentence and so was available at their beck and call. Even the warden (according to Driver), answering an inquiry as to how long the procedure was going to continue, said when they wanted him there was no choice but to produce him. And Driver testified that Keegan and Porter said they knew he was involved in the robbery and intended to question him every day until he admitted his part in it. So they kept "pounding" away at him day after day until, in the early morning hours of August 10, 11 and thereafter, he reached the point where he did not know what was being asked or who asked it. Finally, he found it "just easy to go along with them, I couldn't fight them no more." They had "no regard" for anything he said; he knew it was "hopeless." His sister could not get help for him. So, he said, "there was nothing to do but to go along with them."

Confessions produced by sustained pressure of the type practiced here, whether or not they corroborate other evidence in the hands of the prosecution, are abhorrent to

the democratic process. They are opposed to the deep-rooted feeling of our society that the police must obey the law while enforcing the law, for in the end "life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves." *Blackburn v. State of Alabama, supra,* 361 *U. S.,* at *p.* 207, 80 *S. Ct.* 274. The circumstances surrounding Driver and the nature and duration of the questioning make it plain that the State did not bear the burden of establishing that his will had not been overborne and that the fundamental fairness requirement of the due process clause had not been violated. Justice Frankfurter observed in *Culombe v. Connecticut, supra,* that resolution of the issue of voluntariness requires consideration of all relevant circumstances—"the duration and conditions of detention, * * * the manifest attitude of the police toward him, his physical and mental state, the diverse pressures which sap or sustain his powers of resistance and self-control. * * * The ultimate test remains that which has been the only clearly established test in Anglo-American courts for two hundred years: the test of voluntariness. Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process. * * * The line of distinction is that at which governing self-direction is lost and compulsion, of whatever nature or however infused, propels or helps to propel the confession." 367 *U. S., supra,* at *p.* 602, 81 *S. Ct.,* at *p.* 1879.

Careful scrutiny of all the factors in this case constrains us to declare that the trial court erred in admitting the testimony of the police officers as to the oral confessions of August 10, 11 and 12, and the two unsigned memorandums of those confessions.

As has been noted above, extensive interrogation continued

after the giving of the unsigned statements until the tape recording of September 8 was obtained. According to the State, the recording is corroborative of the statements. In our view, however, it is infected with the same infirmity as the other alleged confessions, and in greater degree. With the accusatory statement of Driver's mother-in-law, and his two unsigned confessions in its possession, the State was in a position to file a murder complaint, arraign him on it, and secure an indictment. See *R. R.* 3:2–3(*a*). Failure to do so promptly increased the burden on the trial judge (and upon this court in reviewing the conviction) of studying the voluntariness of any subsequent confession. Compare *State v. Pierce,* 4 *N. J.* 252 (1950); and see *People v. Waterman,* 9 *N. Y.* 2d 561, 216 *N. Y. S.* 2d 70, 175 *N. E.* 2d 445 (*Ct. App.* 1961).

Moreover, when, as here, one confession is declared to be involuntary and thus inadmissible, a presumption arises that any subsequent confession was the product of the same influence, and such presumption must be overcome by the State before the later confession can qualify as competent evidence. We agree with the Court of Appeals of Maryland that the improper influence is presumed to remain in effect until its cessation is definitely shown; the evidence sufficient to do so must be strong and clear and any doubt on the point must be resolved in favor of the accused. *Edwards v. State,* 194 *Md.* 387, 71 *A.* 2d 487 (1950). In this case not only was the presumption unrebutted but the evidence of its continuance was substantial. Further, we have already alluded to the fact that the September 8 recording was run for us after argument of the appeal. To the extent that defendant's voice was audible at all, it was low and weak in quality, and cannot be regarded as adding any probative force to the State's claim that the confession represented "an essentially free and unconstrained choice."

Under the circumstances, the recording should not have been received in evidence.

## III.

### ADDITIONAL CONSIDERATIONS AFFECTING ADMISSIBILITY OF THE SEPTEMBER 8 RECORDING.

Some questions have been raised as to the admissibility in general of sound recordings. In the early case of *State v. Simon,* 113 *N. J. L.* 521 (*Sup. Ct.* 1934), affirmed 115 *N. J. L.* 207 (*E. & A.* 1935), a phonograph record of a conversation with the State's principal witness, offered for purposes of impeachment, was rejected, one reason being that there can be no cross-examination of the record to determine if the whole conversation was recorded. The opinion was questioned seriously by the Appellate Division in *Barnhart v. United Automobile, etc., Local 669,* 12 *N. J. Super.* 147, 157 (*App. Div.* 1951), and certification was denied by this court, 7 *N. J.* 136 (1951).

■ At the present time the great weight of authority throughout the country sanctions the use of sound recordings where the matter contained therein is competent and relevant. See Annotation, 58 *A. L. R. 2d* 1024 (1958). We adopt that view. As a condition to admissibility, however, the speakers should be identified and it should be shown that (1) the device was capable of taking the conversation or statement, (2) its operator was competent, (3) the recording is authentic and correct, (4) no changes, additions or deletions have been made, and (5) in instances of alleged confessions, that the statements were elicited voluntarily and without any inducement. Annotation, *supra*, at *pp.* 1027, 1032–36; as to confessions, see the many cases cited at *pp.* 1046–47.

■ A wire recorder which catches the actual voice of an accused and of his questioner, may be an invaluable aid to a court and jury where the issue of voluntariness of a confession is raised. See *Williams v. State,* 93 *Okl. Cr.* 260, 226 *P. 2d* 989 (*Crim. Ct. App.* 1951). In fact, the recording may be more satisfactory and persuasive evidence than the written and signed document. In all situations, how-

ever, the trial judge should listen to the recording out of the presence of the jury before allowing it to be used. In this way he can decide whether it is sufficiently audible, intelligible, not obviously fragmented, and, also of considerable importance, whether it contains any improper and prejudicial matter which ought to be deleted. See *Leeth v. State,* 94 *Okl. Cr.* 61, 230 *P. 2d* 942 (*Crim. Ct. App.* 1951).

■ In the matter now before us, therefore, the tape recording was not inadmissible *per se,* so long as its capacity to record accurately, and the other conditions precedent were established. But even if the involuntary character of the recording did not bar it, in our view it should have been excluded. It was garbled, full of static and other foreign sounds; it was unintelligible and inaudible for the most part, and a fair exercise of discretion required the entire tape to be withheld from the jury. In this connection, we note the comment of the trial judge as he listened to it: "If you can't hear it, you can't hear it. Inaudible." He did not specify further. Basic fairness demanded its exclusion. Compare, *People v. Stephens,* 117 *Cal. App. 2d* 653, 256 *P. 2d* 1033 (*D. Ct. App.* 1953). See also, *Hammers v. State,* 337 *P. 2d* 1097, 1109 (*Okl. Cr. App.* 1959).

## IV.

### THE BILL OF PARTICULARS.

■ Defendant served a demand for particulars on the State and, after argument in the Superior Court, Law Division, an order was entered requiring the Prosecutor to answer to the following questions:

"3. Set forth in full the names and addresses of all witnesses through whose testimony or other evidence the State intends to establish, directly or circumstantially, the defendant's presence at the scene of the alleged offense.

4. In the event that it is not alleged that Defendant was present at the scene of the alleged offense, set forth in full the names and addresses of all witnesses through whose testimony or other

evidence the State intends to establish the connection between the alleged crime and the Defendant."

No appeal therefrom was taken by the State. Compare, *State v. Johnson*, 28 *N. J.* 133, 142–144 (1958).

A single answer was furnished to both demands. It gave the names of Sergeant Porter, Lieutenant Keegan and Mrs. Mattie Scott.

At the trial, the State called 28 witnesses in its main case and six in rebuttal. Defendant objected, relying on the order for particulars. Many of the persons produced gave testimony relating to routine matters: the autopsy physician, surveyor, the photographer, persons who saw the Mayer car near Carnegie Lake, etc. Failure to identify such witnesses did not violate the order. Others were called to prove Driver's expenditures following the murder. Perhaps a very broad interpretation of Demand #4 would have required the State to supply those names. On defendant's interlocutory appeal to this court, however, we indicated that defendant should be given a list of such expenditures as the Prosecutor intended to establish at the trial. That suggestion was complied with. Even though the names and addresses of the persons to be called to prove the pertinent facts were omitted, we see no prejudicial error arising from such failure.

The name of one witness, on whom the State placed reliance to prove defendant's participation in the crime, should have been furnished to defendant. He is James G. Savalli, a cook in the Workhouse during Driver's stay there. He was called in rebuttal to testify concerning an alleged important admission made to him by defendant. According to Savalli, in the course of conversation with him Driver said he could not understand why he should be charged with murder when all he did was drive the car. His testimony is of the same character as that of Mrs. Scott and the omission to make the pretrial disclosure of his identity was violative of the order. See *United States v. Neff*, 212

F. 2d 297 (3 Cir. 1954); Riggs v. United States, 280 F. 2d 949 (5 Cir. 1960); United States v. Yarus, 198 F. Supp. 425 (D. N. Y. 1961). If the State intends to call him at the retrial, the error may be rectified.

In connection with the production of Savalli it seems advisable to express the view that he should not have been used as a rebuttal witness. He was just as much a part of the State's main case as Mrs. Scott and should not have been "saved" for rebuttal.

## V.

### THE REQUEST TO CHARGE ON ALIBI.

Defendant's brief defense to the charge was that on the evening of April 4, 1958, he had gone shopping with his wife and had returned home around 10 P. M. A neighbor offered confirmatory testimony. Thereafter, Driver went to the nearby Ewing Tavern which he frequented, and, to the best of his recollection, remained there until sometime between 1 and 2 A. M. Then he went home. There can be no doubt that he was a regular patron of the tavern. According to the bartender, he came in practically every night.

The defense, considering that under the proof alibi was a proper subject to be covered by the trial judge in his instructions to the jury, requested him to charge as follows:

"If a reasonable doubt of guilt is raised, even by inconclusive evidence of an alibi, the Defendant is entitled to the benefit of that doubt and a judgment of acquittal."

He declined to do so, but in our judgment the matter of alibi is properly in the case and should be explained to the jury. The precise language submitted to the court was the subject of a request in State v. De Geralmo, 83 N. J. L. 135, 137 (Sup. Ct. 1912), and in State v. Tanzarello, 1 N. J. Misc. 375 (Sup. Ct. 1923). In both instances, refusal to so charge resulted in a reversal of the conviction. Since

this case is to be retried, the matter is commended to the trial court's attention.

## VI.

### THE PROSECUTOR'S SUMMATION.

Various objections have been raised about the prosecutor's summation. We have examined it in full and will discuss the criticisms as well as some additional remarks appearing therein which should be omitted at retrial.

### A.

In connection with the defense claim that Detective Girard had struck Driver in the face and had failed to take the witness stand to deny it, the Prosecutor pointed out to the jury that defense counsel had not asked Detective Toth if he struck Driver, and then he said:

"Why? Because they know that Driver is lying and that *man* (*obviously meaning Mr. Meredith*) *is not telling the truth when he stood in front of you,* and they can smile all they want but to me it is a serious matter, a very serious matter. Intentionally they placed that man's (Girard) job on the line. Why? To win a case. *They would resort to anything to win this case.*" (Emphasis and first insertion ours)

We consider that form of argument improper, in bad taste, unfair to assigned counsel, and unworthy of a representative of the State.

### B.

The State proved on cross-examination that some years earlier Driver had been convicted on 32 indictments or accusations charging breaking, entering, and larceny, and had served a sentence therefor in New Jersey State

Prison. That was proper but only for the purpose of affecting credibility. *N. J. S.* 2A:81–12; *State v. Holley,* 34 *N. J.* 9 (1961).

In summation, the Assistant Prosecutor described Driver variously as "a hardened criminal; * * * a graduate of that school and it didn't matter to him who was stuck up or what. * * * He went by the way of the law of the jungle and the prison which is the law Driver lives by. * * * *He is a confirmed criminal and robbery is his way of life* and it is only through the grace of God that he went through 32 of these jobs without killing somebody and now that has happened. He went on his last job when his luck ran out." (Emphasis ours)

Comments such as these represent the reason why there is considerable agitation for change in the rule permitting previous conviction of crime to be proved. *State v. Holley, supra.* Attack on credibility is the sole permitted purpose of such an offer but all too frequently arguments, both subtle and plain, are made in summation indicating that the purpose in fact was to influence the jury to believe (1) that since the defendant committed other crimes, he probably committed the one présently charged against him, or (2) that the previous convictions show his propensity toward crime and therefore he probably perpetrated this one, or (3) that his character is so bad that crime is his way of life. That type of comment is highly improper because it has a strong psychological appeal to lay jurors who understandably may be diverted thereby from an independent analysis of the evidence and into the effortless conclusion that "once a thief, always a thief." It warrants immediate intervention by the trial court and a vigorous instruction to counteract the prejudice that flows from it. *State v. Kociolek,* 23 *N. J.* 400, 418–420 (1957); *State v. Arnwine,* 67 *N. J. Super.* 483, *supra; State v. Ascolese,* 59 *N. J. Super.* 393, 397 (*App. Div.* 1960); *State v. Nagy,* 27 *N. J. Super.* 1, 10, 11 (*App. Div.* 1953); and see *State v. Pacheco,* 38 *N. J.* 120 (1962). The admonition of this

court in *State v. Orecchio,* 16 *N. J.* 125, 129 (1954), should not be overlooked:

"The sound administration of criminal justice in our democracy requires that both the end and the means be just. The accused, no matter how abhorrent the offense charged nor how seemingly evident the guilt, is entitled to a fair trial surrounded by the substantive and procedural safeguards which have stood for centuries as bulwarks of liberty in English speaking countries."

True, the trial judge told the jury rather briefly in his charge that previous conviction of crime has "absolutely nothing to do with the charge we are now trying. It is not proof of guilt or innocence of the crime we are now trying. It has to do solely with credibility and whether it does or does not is for your sole exclusive consideration." Since a new trial is to follow, there is no need to decide whether that instruction overcame the remarks outlined above. It seems sufficient to express doubt on the subject because of the obvious misstatement and misuse of the convictions by the Assistant Prosecutor. There was no proof of any previous conviction for robbery. But even if there were such evidence, to argue in this case of robbery-murder, that "robbery" is Driver's "way of life," and that only by the grace of God he had not killed someone else, was to present such an aggravated appeal to prejudice as to leave much question about the curative effect of the court's charge.

## VII.

### THE DEFINITION OF REASONABLE DOUBT IN THE CHARGE OF THE COURT.

In defining reasonable doubt the court did not advise the jury that such a doubt could arise from lack of evidence as well as from "the entire comparison and consideration of all the evidence * * *." In *State v. De Paola,* 5 *N. J.* 1, 9 (1950), it was held to be reversible

error not to so advise the jury upon defendant's request. Since then, as a precautionary measure, it has become customary for trial courts to include that refinement of the definition in their instructions. The advisability of doing so is further indicated by *State v. Walker*, 33 *N. J.* 580, 594–595 (1960).

No such request to charge was presented in this case and the connotation of reasonable doubt advanced by the court is not challenged on this appeal. Consequently, our note here is merely advisory.

## VIII.

We have examined all of the remaining grounds of appeal relied upon by defendant, and have found no prejudicial error requiring reversal other than those already detailed.

Reversed and remanded for a new trial.

*For reversal*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For affirmance*—None.