# CHARLESTON.

STATE v. GLEN MORAN

(No. 5926)

Submitted May 11, 1927.        Decided May 24, 1927.

CRIMINAL LAW—SEARCHES AND SEIZURES—*Search Under Warrant Used Day Previous Held Unreasonable; Evidence of Possession of Intoxicating Liquor Obtained by Search Under Warrant Used Day Previous to Search Held Inadmissible (Code 1923, c. 32-A, §§ 9, 37; Const. art. 3, § 6).*

Where the officers enter and search the defendant's premises under a search warrant issued pursuant to the provisions of section 9 of chapter 32-A, Barnes' Code 1923, and on the afternoon of the second day thereafter again enter and make further search of the premises, under and with the same warrant, on which no return was made following the search made on the first day, the only reason assigned for the abandonment of the first search being that it was dark and they could not look everywhere they wanted to, but no reason is given for the delay in returning, the further or second search is "unreasonable" within the meaning of section 6 of article 3 of the Constitution of this State, and the evidence obtained thereby is inadmissible on the trial of the defendant for the offense charged in the warrant.

(Criminal Law, 16 C. J. § 1110; Searches and Seizures, 35 Cyc. p. 1268.)

(NOTE:    Parenthetical references by Editors, C. J.—Cyc.    Not part of syllabi).

Error to Circuit Court, Marshall County.

Glen Moran was convicted of the possession of moonshine liquor, and he brings error.

*Judgment reversed; verdict set aside; new trial awarded.*

J. Howard Holt, for plaintiff in error.

Howard B. Lee, Attorney General, and J. Luther Wolfe, Assistant Attorney General, for the State.

MILLER, JUDGE:

The defendant was tried and convicted on an indictment charging him with unlawfully and feloniously having in his possession a quantity of moonshine liquor.   The statute, sec-

tion 37 of chapter 32-A of the Code, makes the first offense
a misdemeanor, and section 3 of said chapter provides that
for a second offense under the act, the accused shall be guilty
of a felony, and that ''if it be a second offense, it shall be so
stated in the indictment returned, and the prosecuting attor-
ney shall introduce the record evidence before the trial court
of the conviction of the first offense,'' etc.   The indictment
set forth the fact of the former conviction; and the prose-
cuting attorney had the clerk of the circuit court read into
the evidence before the court and jury, the complete record
of the former trial and conviction.   At the conclusion of the
clerk's testimony, counsel for defendant inquired of him:
''Q. What is the date of that judgment order?   A. 18th of
September, 1923.   Q. And what is the date of the finding
of the indictment now at the bar of this court?   A. This is
the September Term, 1926.''   Counsel then moved to strike
out the evidence of this witness, and excepted to the action
of the court in overruling his motion.

By a bill of exceptions signed by the trial judge, it ap-
pears that defendant's counsel objected to the introduction
of the record of the former conviction, on the ground that,
in May 1924, this same defendant had been tried and acquitted
on an indictment setting forth the same first conviction.   But
there is no evidence in the record of the trial and acquittal
in May 1924.   The only intimation of a trial at that time is
the recital in the bill of exceptions.   The record does not
show that the defendant was indicted for any offense in the
year 1924, or at any time after the conviction in September
1923.   Therefore, we can not consider the question raised by
the bill of exceptions referred to.

The defendant objected to the introduction of the evidence
obtained by a search of his house boat moored in the Ohio
River near the West Virginia shore.   C. K. McCluskey, chief
of police of the town of Glendale, on the 29th day of August,
swore out a warrant for the search of the house boat and
the arrest of the defendant.   Armed with this warrant, he
and a member of the department of public safety made a
search of the boat the same day, but found no evidence of

intoxicating liquor, and did not arrest the defendant. Between two and three o'clock in the afternoon of the 31st of the same month, McCluskey and a deputy sheriff, again entered defendant's boat with the same search warrant and made further search. Finding intoxicating liquor, they arrested the defendant, took with them the liquor, and made a return of the warrant as of that date. No return was made following the first search.

The only reason for making the second search is found in McCluskey's testimony, as follows: "Q. And you went there on the 29th day of August, I believe, first did you not? A. Yes, sir. Q. And you made a search of Mr. Moran's house boat at that time? A. Yes, sir. Q. And you went back on the 31st to make further search? A. Yes, sir. Q. And you did not find anything on the first search? A. No, sir. Q. You had once made search under this search warrant? A. Yes, sir. Q. This is the only search warrant that you had, Mr. McCluskey? A. For that particular place. Q. You made both searches under that warrant? A. Yes, sir. Q. You made a complete search on the 29th of August? A. Not a complete search, it was dark and we couldn't look everywhere we wanted to. Q. But you went over the boat? A. That night. Q. And went away? A. Yes, sir. Q. You did not make any return on this warrant of what you did on the 29th of August? A. No, sir. Q. And then you went back with the same warrant on the 31st? A. Yes, sir."

The form of the warrant involved follows the statute, section 9 of chapter 32-A of the Code, and has been held to be valid. The purpose of this statute was to aid in the apprehension of violators of the prohibition laws and in securing evidence against them. It gives to any justice of the peace jurisdiction, upon information made under oath or examination, to issue his warrant requiring the person suspected to be brought before him for examination, and the house, building or other place, where the information alleges the contraband liquors are kept, to be searched. The officers in this case had lawful authority to enter the premises of the defendant and search his house boat, in which he and his family lived,

for evidence of the possession of intoxicating liquors. The question here presented is whether the manner of the execution of the warrant was a violation of the fourth amendment of the Constitution of the United States and section 6 of article 3 of the Constitution of this State, providing against unreasonable searches and seizures.

No reason is given for the abandonment of the first search, except that "it was dark and we couldn't look everywhere we wanted to." No reason whatever was given for delaying the search until the afternoon of the second day thereafter, a period of probably forty hours or more. And it does not appear what time in the day or night the officers entered the boat on the 29th, or how long they were there. McCluskey said they made a search of the boat; went over it, and went away. Neither of the officers testified that when they left after the first search they had any intention of returning. And it appears from McCluskey's testimony that defendant's house boat had been there for three or four weeks, and that he had been watching it "about three nights out of the week," and had seen intoxicated men about the place; and on the day he made the second search he had picked up two intoxicated men on the bank above the boat. And it may be inferred that this prompted him to make the search that day.

It is not necessary to discuss here the law in this country and in England relative to searches of private residences, and the extent to which the courts of all English speaking peoples have resorted to guard most zealously the "rights of the citizens to be secure in their houses, persons, papers and effects against unreasonable searches and seizures." We do not have to resort to our written constitutions for this principle. It was so thoroughly grounded in the unwritten law of England and the Colonies that it was not thought necessary to incorporate in the Constitution of the United States what was afterwards made the subject of the Fourth and Fifth amendments. The history for the reason of these amendments is too well known to need repeating here. In speaking of the storm of protest raised against the acts of Colonial revenue officers, armed with writs of assistance, in

searching suspected places for smuggled goods, John Adams said: "Then and there was the first scene of the first great act of opposition to the arbitrary claims of Great Britain. Then and there the child of Independence was born." Quoted in *Boyd* v. *United States,* 116 U. S. 616, 625. Search warrants were unknown to the common law. Even searching for stolen goods crept into the law by imperceptible practice; and Lord Coke denied its legality. 4 Inst. 176. Judge Cooley says: "But as search warrants are a species of process exceedingly arbitrary in character, and which ought not to be resorted to except for very urgent and satisfactory reasons, the rules of law which pertain to them are of more than ordinary strictness; and if the party acting under them expects legal protection, it is essential that these rules be carefully observed." Const. Limitations, (7th ed.), 429.

The language of both of our constitutions is "unreasonable searches," not "unlawful." The officers had a valid warrant, and lawful right to make a search. But was not the method employed by them unreasonable? If their search on the 29th was not complete, and they abandoned it because of darkness, why did they not return the next morning, at the earliest opportunity, or give some reason for the delay? No reason is given, unless it be inferred that they were waiting until they were sure they would find liquor on the boat. Such procedure might be most convenient to the officers, but that was the reason or excuse given for the use of the Colonial writs of assistance. It is true those writs gave the officers arbitrary power to search wherever they chose, but here the officers, though armed with legal right, exercised arbitrary power to search whenever and as often as they chose. Is not the one case as odious and objectionable as the other? The arbitrary and unlawful exercise of authority conferred by law may become as dangerous to civil liberty as the wholly unauthorized acts of public police officers, especially when such authority is placed in the hands of "a mere ministerial officer, who brings with him such assistants as he pleases, and who will select them more often with reference to physical strength and courage than to their sensitive regard to the

rights and feelings of others.'' Cooley, p. 432. The record does not disclose the character of the officers in this case; but for whatever they may be worth here, a number of affidavits filed on defendant's motion for a new trial charge that Mc-Cluskey was guilty of soliciting and receiving bribes from persons accused of crime, and of turning them loose when he was paid to do so; and the affidavit of the mayor of the town of Glendale states that McCluskey was removed from office, and that the affiant did not know where he was at the time. It appears from one of the affidavits that he defaulted and left with money belonging to the town. It is hardly probable that such serious charges would be voluntarily made in this manner, if not true.

Insurrection, rebellion and anarchy are the result of arbitrary and unreasonable exercise of the powers of government in the hands of those intrusted with the administration of the law. The history of Continental Europe bears witness of this; and we may well profit thereby. Much of the present day disrespect for and opposition to the prohibition laws may be laid to the methods resorted to in the attempt to enforce them. Expediency can not be made the reason for a rule of criminal law. Such practices are dangerous; and officers intrusted with the enforcement of the law should go no further than is necessary in executing process directed to them, when private civil rights are involved. If a police officer may carry about with him a search warrant, and use it more than once, and thus carry over the head of citizens a club, as it were, where will such practice lead to; and where, in such case, shall we draw the line between reasonable and unreasonable use of such warrants? In any of the cities or towns in this State it is a very simple matter and takes but a few minutes to secure a search warrant when one is needed.

In *State* v. *Pachesa,* 102 W. Va. 607, 135 S. E. 908, we held that the execution of a similar search warrant fifty days after it was issued, unexplained by the evidence or justified by the circumstances, was, as a matter of law, an ''unreasonable'' search within the meaning of the constitutional prohibition

here relied on.    See, also, *State* v. *John,* 103 W. Va. 148, 136
S. E. 842.

No reason being given by the officers for the delay in com-
pleting the search, if indeed it was not completed on August
29th, we ·hold that the second search was "unreasonable,"
and that the evidence obtained thereby should have been
rejected on the trial.

The judgment will be reversed, the verdict of the jury set
aside, and the defendant awarded a new trial.

*Judgment reversed; verdict set aside; new trial awarded.*