83 N.J. Super. 430 (1964)
200 A.2d 340
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
LESLEY R. PARSONS, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued September 9, 1963.
Remand Ordered November 8, 1963.
Reargued on Supplemental Record April 20, 1964.
Decided May 5, 1964.
*432 Before Judges CONFORD, FREUND and SULLIVAN.
Mr. Julius Cohn (assigned counsel), argued the cause for appellant.
Mr. John F. Russo, Ocean County Assistant Prosecutor, argued the cause for respondent (Mr. William H. Huber, Ocean County Prosecutor, attorney).
*433 The opinion of the court was delivered by CONFORD, S.J.A.D.
This unfortunately protracted appeal comes before us for final consideration after prior argument and completion of proceedings on remand ordered by this court November 8, 1963 after such argument for the purpose of giving the State an opportunity to rehabilitate by testimony the validity of certain searches and seizures apparently instrumental in obtaining the conviction of defendant on three of the four counts of breaking and entering and three of the four counts of larceny of the indictment tried. No question was raised at the original trial concerning illegality of search and seizure, as the case was tried prior to the decision in Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).
At the prior argument we considered, in addition to the search and seizure point, an attack upon the conviction by reason of testimonial references to a polygraph (lie-detector) test refused by defendant and to one taken by a State's witness. We now dispose of all points raised on both arguments.
Defendant was tried in April 1961 for breaking and entering and larceny involving ten different locations. He was acquitted of the charges in relation to six of the places but convicted on four counts of breaking and entering and four counts of larceny involving the other four locations, these being Airship Tavern, Manchester Township, about December 1, 1960; Alligator Inn, Jackson Township, about December 1, 1960; Warren Concrete Tank Co., Ocean Township, about December 26, 1960; and Bargain Center, Dover Township, about January 7, 1961; all being in Ocean County.

I.
We first discuss the grounds of appeal concerning allusions to polygraph tests.
The main basis of the State's evidence against defendant, known as Gene Forest as well as by his true name of Parsons, was the testimony of one Edward Wilds who described *434 himself as an accomplice of Parsons in all of the thefts and gave detailed accounts of the execution of the crimes. Parsons' defense was a flat denial that he had participated in any of the episodes, claiming not to have been present on any of the occasions recounted by Wilds except for one where he admitted being in the vicinity but not a participant in the breaking. Wilds at first gave the police several statements exculpating Parsons of any connection with the crimes, but finally changed his story to involve the defendant. The State's position is that Wilds was motivated to finally tell the truth because, after giving the exculpatory statements, he was administered a polygraph test which showed he had been lying in such statements, and that when he was informed of the test result and therefore knew he could no longer credibly protect Parsons, he decided to make a clean breast of the whole matter. The manner of the State's development of these circumstances is the crux of this phase of the appeal, the Supreme Court having recently reaffirmed the long and well-nigh universally held view that the results of polygraph tests are inadmissible. State v. Driver, 38 N.J. 255, 262 (1962). The court there decided that a prosecutor's reference to a defendant's refusal to take such a test is plain error as possessing a "horrendous capacity for prejudice." See also State v. Walker, 37 N.J. 208, 214-217 (1962); State v. Arnwine, 67 N.J. Super. 483 (App. Div. 1961); State v. LaRocca, 81 N.J. Super. 40 (App. Div. 1963).
So far as appears from the transcript furnished us, the first reference to the lie-detector test taken by Wilds occurred during the direct examination of that witness by the State. He was first examined concerning certain silver dollars stolen from the Bargain Center which he and Parsons were trying to exchange at a bank when first apprehended, and he testified they belonged to Parsons, implying they were Parsons' partial share of the fruits of that robbery. He testified that when first questioned by the police he told them he was not involved in any robberies but later that night admitted he broke into the Bargain Center. He did not then implicate Parsons *435 "because they didn't have any proof on him." For the next week and a half he gave the police statements that it was only he "that did these jobs." He was asked why it was that, in a statement he gave the police January 17, 1961 (wherein he said no one was with him on "the jobs"), he admitted three or four "jobs" but later confessed to 12 or 13. He said "they didn't have any kind of proof on us," but then "they gave me a lie-detector test. The lie detector test showed that I had been  ." At that point defense counsel objected that the witness was not "competent to testify as to that," but the court ruled the State could show the witness was advised of the results of the test and inquire as to what, if anything, he did as a result. The witness then testified that the polygraph examiner told a State Trooper in his presence "what the results were * * * and that I had lied about not having Gene Forest with me * * * ." The court at once admonished the jury not to consider "these statements" because not made under oath.
Wilds was then asked to say what he said or did "as a result of what you heard." He testified he then made a complete confession to the police. Further:
"Q. Do I understand you to say that you attempted to conceal Parsons' presence with you until the results of the lie detector test?
A. That's right.
Q. You realized there was no use any more. A. That's right.
Q. You told the whole story. A. Yes.
Q. Is this story the truth? A. Yes."
Wilds then continued with the details of all the crimes involving Parsons' participation, including those of which the latter was convicted.
On cross-examination, defense counsel went over each of Wilds' original statements exculpating Parsons and offered them into evidence. On redirect examination, the State again had the witness confirm that "after it became obvious under the polygraph test, you couldn't cover up, you then gave a true statement."
*436 We are satisfied that the admission of Wilds' testimony concerning his change of story as to Parsons' guilt after being informed of the result of the polygraph test was prejudicial error; moreover, that it was plain error if the defense objection is regarded as not having been pinpointed to the matter of admissibility or not adequately repeated as the full scope of the testimony was developed (points not raised by the State). If, as was held in State v. Driver, supra, the reference to a refusal of a defendant to take a lie-detector test was plain error as infected with a "horrendous capacity for prejudice," the defense position here is as strong or stronger. Here, the inferences from Wilds' testimony are little if anything short of unequivocal to the effect that the polygraph test he took disclosed that he had been lying when he first told the police that the defendant was not with him when the crimes were committed. Any possibility of doubt as to the communication of this information to the jury was erased by Wilds' testimony that the polygraph examiner said the tests showed Wilds lied when he said Parsons was not with him, testimony hardly minimized in its cumulative impact by the court's instruction to the jury to disregard it as hearsay. The jury was thus in effect informed, and repeatedly, that the lie-detector test showed that the defendant was a co-participant in the series of breakings and thefts related by Wilds.
It matters not that the damaging evidence was elicited by means of disclosure of the result of a lie-detector test administered to a witness rather than to the defendant, where the witness is one who when he took the test knew whether the defendant was guilty or not. Cf. Kaminski v. State, 63 So.2d 339 (Fla. Sup. Ct. 1953); People v. Carter, 48 Cal.2d 737, 312 P.2d 665 (Sup. Ct. 1957). And see State v. Arnwine, supra (67 N.J. Super., at pp. 496-497). The prejudicial effect is logically identical. Nor does it matter that the disclosure is by indirection rather than directly. Ibid., and see State v. LaRocca, supra (81 N.J. Super., at pp. 46-47).
The harmful effect of the foregoing trial occurrence was rooted more firmly when the State sought to corroborate *437 Wilds' testimony by that of State Trooper Casey. The State elicited from him testimony that he asked Wilds at the county jail to take a polygraph examination, whereupon the defense objected that "the findings on a polygraph test are inadmissible, so anything leading up to that is absolutely inadmissible." There then ensued a colloquy before the jury wherein the prosecutor said he did not propose to adduce "the result of the test" but "only what happened before or after the polygraph test was given to him." And when a further defense objection to a question to Casey as to why Wilds was willing to give a revised statement after he took the test, was made, on grounds of hearsay, the prosecutor repeated in the form of argument the entire substance of Wilds' previous testimony on the point which we have held itself was prejudicial.
We fully appreciate that it was the State's position at trial, and is now on appeal, that there was no purpose to apprise the jury of the result of Wilds' polygraph test, but only to fortify his credibility against the expected effort of the defense to attack it on the basis of the previous inconsistent statements by Wilds as to Parsons' participation. Preliminarily, if this were a valid reason, the effort should at least have been withheld until after the defense launched the attack on Wilds' credibility so as to avoid the inevitable prejudice to the defense unless and until it was absolutely necessary. Credibility ordinarily cannot be rehabilitated until attacked. McCormick, Evidence (1954), § 49, p. 105. Cf. State v. Sullivan, 24 N.J. 18, 39 (1957); State v. Neiman, 123 N.J.L. 341 (Sup. Ct. 1939), affirmed o.b. 124 N.J.L. 562 (E. & A. 1940). Here the effort at rehabilitation was made on Wilds' direct examination.
But more fundamentally, we are of the opinion that the ostensibly proper objective of rehabilitation of a witness's impaired (so assuming) credibility cannot be served in this particular manner in view of the strong judicial hostility in this State to evidence of lie-detector tests, results thereof, or inferences from attitudes of persons toward taking them. First and foremost, the harm to the defendant from what was *438 done here in our judgment far outweighed any need of the State. Second, it is dubious if the credibility of a maker of false statements to law enforcement officers is enhanced by attempting to show he later told them the truth when he thought he had no further chance of deceiving them. The State was not here trying to refute the proposition that Wilds' previous statements impaired his credibility, cf. 4 Wigmore, Evidence (3d ed. 1940), § 1126, p. 197, but to show the likelihood of the truth of his last statement to the police and of his current testimony on the basis of the hypothesis that since he was a believer in the accuracy of lie-detector tests he had lost the motivation for continued concealment of Parsons' involvement because found by the polygraph apparatus to have been lying when attempting to protect him. In certain cases fortification (at a proper time) of the credibility of a witness may be permissible. But the means here used involved the calculated reliance by the State upon the jury's acceptance of the inference that Wilds believed that lie-detector tests are reliable. The probative effect of that showing would, in turn, inevitably depend somewhat upon the lay jury's similar belief in such tests. The entire approach implicates the very evil which the Driver rule so strongly deprecates.
The Wilds testimony mentioned above will for the reasons stated require a reversal.
We point out, however, that if at the retrial Wilds should on cross-examination be asked any questions to which a responsive answer requires reference to the polygraph tests this will not be reversible error since it will have been directly induced by defendant.
Defendant argues for reversal on the separate ground that the failure of his trial counsel to object to his own voluntary allusion on cross-examination to his refusal to take a polygraph test, or to request the court to instruct the jury to disregard the allusion, is plain error. While it would have been appropriate for trial counsel to do so, the point does not involve reversible error. An appellant is not ordinarily permitted to take advantage on appeal of trial errors he himself *439 created. Bahrey v. Poniatishin, 95 N.J.L. 128 (E. & A. 1920). In any event, there is to be a retrial in this case wherein another such allusion can be avoided.

II.
As will appear, we have concluded that at least some of the evidence admitted at the trial resulted from illegal search and seizure. Since the subject matter of (I), hereinabove, requires a reversal independently, we will confine our discussion of the search and seizure issues to the questions as to what evidence is disqualified for admission at the retrial to be held herein. For the sake of clarity, we recount the pertinent facts in chronological sequence, together with the findings of the trial judge on the remand.
The first contact between the defendant and Wilds and the police was in Wrightstown on January 13, 1961. They approached the drive-in window of the Peoples National Bank and Trust Co. in that town in an "old" Cadillac, owned and driven by Wilds. Defendant was in the front passenger's seat. Wilds handed 19 silver dollars to the teller, one Bessie Fow, and asked that they be redeemed. She considered the request "a bit unusual" and asked Wilds where he and Parsons were from. When he told her he lived in Toms River, she became more suspicious. At that moment State Trooper Jones entered the bank, and after discussing the situation with Mrs. Fow, instructed her to request the driver's (Wilds) identification. Wilds submitted his license and registration from which the trooper noticed that the car had not been inspected. He told Wilds to pull over into a nearby parking lot and called a Trooper Wolfe for assistance. When Wolfe arrived, Jones asked defendant or Wilds (he could not remember which) if they could look in the trunk. Parsons testified the inquiry was directed to Wilds and that the latter said he had no objection. The troopers then searched the trunk and found several packs of cigarettes (Eisenhower Bar counts; defendant acquitted), and several pairs of trousers (Bargain Center counts; defendant convicted).
*440 Wilds and defendant were taken to the Fort Dix Police Station for further questioning. A Trooper Casey subsequently recovered the silver dollars (Bargain Center counts) from the bank. At the Fort Dix station, a Trooper Manning made a thorough search of the car and seized the above-mentioned cigarettes and clothing. At the remand, only defendant testified to this incident. He said that Jones ordered Wilds to open the trunk of the car. He added that although the Cadillac was owned by Wilds, he and Wilds used it interchangeably. All the articles mentioned were admitted in evidence.
The trial judge found on the remand that the convictions on the Bargain Center counts were affected by introduction of the "clothes and cigarettes" (instead of "cigarettes" he must have meant silver dollars) and that the search was not incident to the arrest of defendant or Wilds. He held the search valid, however, as "there was probable cause for the search and seizure even without a search warrant." Such probable cause was thought to be constituted by the unusual amount of rare coins presented, the residence of Wilds in Toms River, and the fact that, as Mrs. Fow testified, defendant kept his face turned away from her. The search was necessary, the court concluded, because the defendant and Wilds were in a car and "could easily drive away if the officers withdrew to obtain a search warrant." It also found that "the search was not objectionable with regard to Parsons because it was made of Wilds car, not Parsons car."
Parsons was held at the Fort Dix Station that night, and on the following morning (January 14, 1961) he was taken to the Ocean County jail. On the way there, Parsons, in the custody of Detective Vought and another detective, was taken to his home in Lanoka Harbor to get some clothing. Vought testified that this was at Parsons' request and that no search was made of the house at that time. It was on this visit, however, that Vought first noticed a broken cellar step. This was relevant to the Alligator Inn counts, as to which defendant was convicted. There was testimony that a safe stolen therefrom was dragged into Parsons' cellar. At the remand *441 Parsons gave no testimony concerning this incident and the trial judge found that this visit to the home was at the request of defendant.
At a hearing before a magistrate on January 14 Wilds exculpated defendant and the latter was released from custody.
Between January 14 and 18, 1961 Wilds gave the police his statement involving Parsons. The police checked out the story and were convinced of its reliability, whereupon Detective Vought and Trooper Casey went to Parsons' home on January 18 to arrest him. On the remand Vought testified that there was no search made at that time, but again the broken cellar step was noticed. Parsons, on the other hand, testified that when the officers came to arrest him, they pushed him aside and searched the house from top to bottom. Nothing was seized. This contradictory testimony was not resolved by the court.
On January 19, the day after Parsons' arrest, Vought and Detective Woolley went to the office of Magistrate Wheeler to obtain a search warrant for defendant's house. (The magistrate is now deceased.) Vought and Woolley testified at the remand that the former was placed under oath by the magistrate and explained to him in detail the contents of the inculpatory statement given by Wilds concerning Parsons' alleged criminal activities. Vought also told the magistrate that Wilds had previously given contradictory statements, that the statement inculpating defendant had been checked by comparing Wilds' description of how the various premises had been entered with the facts known to the police and by the discovery of the Alligator Inn safe in a pond, as pointed out by Wilds, and that when Parsons was arrested on January 13 he was in a car in which merchandise stolen from the Bargain Center had been found. Vought also told the magistrate about the broken cellar step he had observed in Parsons' home.
Magistrate Wheeler issued a search warrant, but no copy of the warrant has been found. Inferably, the place therein authorized to be searched was that specified in the complaint for the warrant. This mentioned the "premises," which were *442 described therein as "a frame dwelling house situated on Foreest [sic] Ave., Lanoka Harbor, N.J., (Residence of Forrest [defendant])." No proof was given concerning the time within which return under the warrant was to be made.
The trial judge held that the testimony under oath given by Vought to the magistrate was sufficient to constitute probable cause upon which to issue the search warrant.
After obtaining the search warrant, the officers proceeded to Parsons' house and conducted their search. They seized scrapings from the floor of the cellar which were subsequently found to have come from a safe stolen from the Alligator Inn. They also seized a portion of the broken cellar step. The officers searched defendant's automobile which was parked in the street in front of the house (the trial judge erroneously found that the car was parked in the driveway). Scrapings from the Alligator Inn and Warren Concrete safes were taken from the trunk of the car, as was a broken portion of a bakelite handle from the latter safe and a chisel.
The trial judge upheld these searches as being based on the warrant. He found that "a warrant covering `premises' of the defendant authorizes a search of the defendant's car found parked in the driveway of the premises outside the house * * *."
On January 24, 1961 Vought and a photographer returned to the house. Pictures were taken of the outside of the house, the steps and floor of the cellar, and the car and its trunk. These were introduced at the original trial. The trial judge was "unable to make a finding as to whether the photos were taken within the time limited in the search warrant or afterward," since the warrant was not produced. He concluded, however, that the photographs were not prejudicial, but merely corroborative of oral testimony.
We first turn our attention to the matter of the search of Wilds' car at the Wrightstown bank. The State has not argued the legality of this search. Its position is that defendant has no standing to contest the search since the car was owned by Wilds. As noted, the trial judge agreed with this *443 contention, but he also found the search to be valid. Parenthetically, the State has not argued there was validating consent to search the car, nor has the trial court so found. We assume all concerned have treated Wilds' and defendant's acquiescence, if any, as a submission to police authority such as not to excuse any illegality in the search and seizure.
The State cites State v. Bibbo, 83 N.J. Super. 36 (App. Div. 1964), to support its position that defendant lacks standing to object to the search because the vehicle was "neither in his possession nor was it under his ownership." That opinion recognizes that a guest in the place searched has status to object (83 N.J. Super., at p. 38). Parsons was at least a guest. In fact, he testified that he and Wilds used the car interchangeably. But in our view the matter of defendant's standing here is controlled by Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), a decision which designedly liberalized the law with respect to the position of those claiming to be aggrieved by an illegal search although only incidentally present in the place searched.
In Jones it was held that a guest in an apartment present when a successful search for narcotics occurred had status to attack the search when he was subsequently indicted for possession of the narcotics found there. The court held (362 U.S., at p. 267, 80 S.Ct., at p. 734, 4 L.Ed.2d 697): "* * * anyone legitimately on premises where a search occurs may challenge its legality by way of a motion to suppress, when its fruits are proposed to be used against him." The standard set forth in this holding is met in the instant case. Defendant was "legitimately" in the car (vis a vis Wilds) at the time it was searched by the state troopers, and the fruits of the search thereof were used to secure the convictions appealed from in respect of two of the counts of the indictment. Cf. State v. Taylor, 81 N.J. Super. 296 (App. Div. 1963). In Jones, supra (362 U.S., at pp. 266-267, 80 S.Ct. 725, 4 L.Ed.2d 697), the court expressly rejected the test proposed by the State here, that based on "possession" or "ownership."
*444 Having concluded that defendant has standing to attack the search of the car, the next question is its legality. Assuming, arguendo, a legitimate need on the part of the police to proceed without warrant (because of the mobility of the vehicle; note, the search was not incident to arrest), the essential question is whether probable cause existed for the search. We conclude that it did not.
The requisites of probable cause here are reasonable grounds for belief that an offense has been or is being committed and that articles relative to such offense properly subject to seizure are contained in the place to be searched. The "facts and circumstances" relied upon by the trial judge in his finding that probable cause existed were: (1) time of day ("relatively early in the morning"); (2) defendant and Wilds were from Toms River ("where they could have changed the dollars"); (3) "unusually large amount of relatively rare coins"; (4) defendant kept his face turned away from the cashier. These circumstances in conjunction may possibly have justified suspicion but they do not in our judgment amount to that quantum of evidence which would "warrant a man of reasonable caution in the belief" that the occupants of the car had committed a crime. Brinegar v. United States, 338 U.S. 160, 175-176, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949).
The conduct of the officers is of some significance in determining the existence of probable cause in the eyes of the "prudent" man. State v. Taylor, supra (81 N.J. Super., at pp. 308-309). Obviously, the troopers here did not think they had probable cause for an arrest before the search. In fact, Jones and Wolfe testified at the trial that they asked Wilds' permission to look in the trunk. The proofs do not reasonably justify any conclusion but that the search was exploratory in purpose and was merely an investigation based on the officers' suspicions. A search so motivated is not supportable as founded on probable cause. Id., at p. 310. We conclude that the search was invalid.
The search of the car at the bank having been unlawful, we must also conclude that the arrest of defendant based *445 upon the search, and the subsequent seizure of the clothing and silver dollars, were also invalid as constituting an "exploitation of that illegality." Wong Sun v. United States, 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). The conviction of the Bargain Center thefts is vitiated by the introduction of this evidence.
In view of the reversal on other grounds we are not called upon to analyze the effect of the admission of the foregoing evidence on defendant's conviction of the other offenses charged.
We next consider the validity of the subsequent searches.
As already seen, the comprehensive search of defendant's house and car on January 19 was made pursuant to a search warrant. If the testimony of Vought and Woolley on the remand is believed, there can be no question but that probable cause existed for the issuance of that warrant. Submission of proof in the form of sworn oral testimony to the magistrate was satisfactory. State v. Moriarty, 39 N.J. 502, 503 (1963). The trial judge chose to believe the testimony of the detectives as to what was testified to before the magistrate, and we have no reason not to accept the consequent findings. Further, contrary to defendant's assertion, the trial court also found it to have been the fact that the magistrate was informed not only concerning Wilds' inculpation of Parsons but also that Wilds originally told the police Parsons was not involved in the offenses. We likewise accept this finding. The search warrant was valid, and the search of Parsons' house pursuant thereto was lawful.
But defendant contends that because the State did not prove that the officers executed a proper return on the warrant, all of the evidence obtained thereunder must be suppressed. The rule is, however, that a return of a search warrant is a ministerial act affecting the officer's protection under the warrant. Any deficiency or failure in the return does not void the warrant or search thereunder, even if no return is made at all. Rose v. United States, 274 F. 245, 250-251 (6 Cir. 1921); Evans v. United States, 242 F.2d 534, 536 (6 *446 Cir. 1957), cert. denied 353 U.S. 976, 77 S.Ct. 1059, 1 L.Ed.2d 1137 (1957); Rettich v. United States, 84 F.2d 118, 121 (1 Cir. 1936); and see State v. Blackwell, 49 N.J. Super. 451, 454 (App. Div. 1958), certification denied sub nom. State v. Barrecchia, 26 N.J. 304 (1958).
Defendant also challenges the validity of the search of Parsons' car made on the same occasion that the house was searched as not authorized by the warrant. Does a car parked on the street in front of defendant's house come within the description in a warrant which authorizes a search of the "premises" occupied by defendant, to wit, "a frame dwelling house situated on Foreest Ave., Lanoka Harbor, N.J." (as noted above, this description is taken from the complaint for the warrant)? There is no direct evidence as to how the description in the warrant was worded, but we have been assuming that the warrant was worded like the complaint in this regard. Detective Vought testified the car was "outside of what I call the property limits."
We find no federal or New Jersey case precisely in point. There is a line of Oklahoma cases which stands for the proposition, urged here by the State, that a warrant authorizing a search of a suspect's premises authorizes a search of cars found thereon. Leslie v. State, 294 P.2d 854 (Okl. Cr. Ct. App. 1956) (cases collected). These cases are distinguishable from the instant one in that they involved descriptions which included such addenda as "and the curtilage" or "and appurtenances," and in that the cars there searched were found in the driveways. See 79 C.J.S. Searches and Seizures § 83, pp. 902-903, which collects state cases on this point.
We hold the warrant did not authorize search of the car. It was on the street, not on defendant's premises. We therefore need not decide whether it should have been expressly mentioned in the warrant. See State v. Ratushny, 82 N.J. Super. 499 (App. Div. 1964), where we held a warrant authorizing search of an entire four-family apartment house defective as against an affidavit showing probable cause as to only one apartment therein. Cf. the requirement that a warrant *447 directed at a vehicle must specifically describe that vehicle, 79 C.J.S. Searches and Seizures § 81a, pp. 886-887, and the requirement that if a person is to be searched during execution of a warrant directed at premises, the warrant must name the person. Carney v. United States, 79 F.2d 821, 822 (6 Cir. 1935); United States v. Diange, 32 F. Supp. 14 (W.D. Pa. 1940).
Although the search of the car was unlawful, this does not invalidate the lawful search of the house. See Rising Sun Brewing Co. v. United States, 55 F.2d 827 (3 Cir. 1932), wherein the court found that a lawful search under warrant of premises "A" was not invalidated by the fact that the officers also unlawfully searched premises "B" across the street.
The next inquiry is as to whether the pictures taken at defendant's home on January 24, 1961 are admissible in evidence. Justification for the entry to obtain those pictures must rest on the search warrant issued on January 19. Since we have concluded that the warrant did not authorize the consequent search of the defendant's car, it must follow for this reason alone that the photographs of the car trunk are inadmissible. However, with respect to the photographs of both the cellar of the house and of the car trunk, since the initial searches of the car and cellar were made on January 19 but the photos were not taken until January 24, the issue is squarely framed: Can more than one search be made under a search warrant? The cases point to a negative response. State v. Pina, 94 Ariz. 243, 383 P.2d 167 (Sup. Ct. 1963) (second search four hours after first held unlawful); see also McDonald v. State, 195 Tenn. 282, 259 S.W.2d 524 (Sup. Ct. 1953); Duncan v. State, 11 Okl. Cr. 217, 144 P. 629, 632 (Cr. Ct. App. 1914); Gamble v. Keyes, 35 S.D. 644, 153 N.W. 888, 890 (Sup. Ct. 1915); State v. Moran, 103 W. Va. 753, 138 S.E. 366, 368 (Sup. Ct. App. 1927); McDaniel v. State, 197 Ind. 179, 150 N.E. 50 (Sup. Ct. 1926). And cf. United States v. American Brewing Co., 296 F. 772, 777 *448 (E.D. Pa. 1924). The reason given for this principle is that, if a warrant may be used to make two searches, the officers
"* * * may use it to make an indefinite number of such searches * * *. Thus, this warrant could become a means of tyrannical oppression in the hands of an unscrupulous officer to the disturbance or destruction of the peaceful enjoyment of the home or workshop of him or her against whom the efforts of such officer are directed." McDonald v. State, supra (259 S.W.2d, at p. 524).
We therefore hold all of the photographs taken on January 24, 1961 to be inadmissible in evidence.
In summary, the following articles will be inadmissible for purposes of the retrial unless a different factual basis for admissibility is established: (1) silver dollars and clothing seized as a result of the search of Wilds' car on January 13; (2) scrapings, chisel, and bakelite safe handle found in defendant's car on January 19; (3) photographs taken on January 24.
Finally, we comment on the search incidents on January 14 and 18, 1961. The observation of the broken cellar step on the 14th was unquestionably a fruit of the unlawful search and arrest on the 13th at Wrightstown since the officers were on their way to arraign defendant on the 14th. But this does not make the fact of the broken step "sacred and inaccessible." Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392, 40 S.Ct. 182, 64 L.Ed. 319 (1920). Knowledge of this fact was gained from an "independent source," ibid., the lawful search under warrant on the 19th.
Defendant claimed that a thorough search of the house occurred on the 18th when the officers came to arrest him. The trial judge made no finding on the conflict between this testimony and Vought's denial that there was a search at that time. Nor is there any finding whether this search was incidental to the arrest. In any event, defendant has not claimed or shown that any evidence was found as a result of this search or that any such evidence, if found, was introduced at the trial. The matter is therefore inconsequential.
Reversed and remanded for a new trial.
*449 SULLIVAN, J.A.D. (concurring).
I concur in the result reached by my brethren. However, I do not agree that upon the retrial, if defendant should attack the credibility of State's witness Wilds by showing that Wilds first gave the police a number of statements exculpating defendant, the State should not be permitted to show that there was a reason for Wilds' change of story and what that reason was. It seems to me that if defendant chooses to put Wilds' credibility in issue, the State can show that Wilds' change of story was not pure whim or caprice.