128 N.J. Super. 120 (1974)
319 A.2d 247
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
SAMUEL LEE CLARK, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued April 10, 1974.
Decided April 23, 1974.
*121 Before Judges HALPERN, MATTHEWS and BISCHOFF.
Mr. Edward Carl Broege, Designated Attorney, argued the cause for appellant (Mr. Stanley C. Van Ness, Public Defender, attorney).
*122 Mr. Howard Allen Cohen, Deputy Attorney General, argued the cause for respondent (Mr. William F. Hyland, Attorney General of New Jersey, attorney; Mr. George F. Kugler, Jr., former Attorney General of New Jersey).
PER CURIAM.
Defendant Samuel L. Clark appeals from a conviction of second-degree murder and the imposition of a 24-25-year consecutive sentence.
Defendant was indicted for the April 27, 1971 murder of one Robert Sayles. The first trial of the indictment terminated in a mistrial when the jury failed to agree on a verdict. A second trial, before a different judge and a jury, resulted in a verdict of guilty of second-degree murder. A motion for a new trial was denied. Subsequently, defendant was sentenced to 24 to 25 years in State Prison, to be served consecutively to sentences of 30 years for rape and a consecutive 5-7-year term for robbery, then being served.
While this appeal was pending the State petitioned the Supreme Court for certification, but its application was denied.
At the time of Sayles' death he and defendant were inmates at Trenton State Prison, then confined to ward one of the prison hospital. Sayles' death was discovered at 7:02 A.M. on April 27, 1971. The cause of death was determined by the deputy county medical examiner to have been asphyxia due to suffocation by ligature or strangulation. Time of death was estimated between 1 and 4 A.M. The State produced testimony from which the jury could find that Sayles' assailant was a ward one patient, and that the strangulation did not occur in bed.
Ward one is a large, rectangular room with screened and barred windows at each end. Entrance is gained through a sliding, metal grill gate which is padlocked during the night. The guard on duty possesses the only key. The ward contains 12 beds. A bathroom area, containing an enclosed toilet and a curtained tub, faces beds 11 and 12.
*123 On the night of April 26-27, 1971 ward one was locked between midnight and 5:30 A.M. The night nurse made her final evening rounds at midnight. The deceased spoke to her at this time. After the nurse left the ward the correction officer immediately locked the gate. Although the nurse returned at 1 A.M. to order defendant and inmate Pryor to bed, she did not reenter the ward. According to the correction officer the gate remained closed until 5:30 A.M. when morning medication was administered. At this time both the correction officer and nurse noticed that Sayles was in his bed in the left corner of the room. He was completely covered, and no movement was detected. He was in the same position when he was found dead at 7 A.M. He was dressed in a white prison-issue pajama top and yellow "civilian" pajama bottoms. The pajama bottoms were streaked with dirt and pulled below the hip bone. The pajama legs were not crumpled, as normally occurs during sleep.
On April 26-27, 1971 seven inmates were confined to ward one. Libertat Nieves was assigned bed 3; William Fuller, bed 6; Arthur Daniels, bed 7; William Miles, bed 8; defendant Samuel Clark, bed 9; Leon Pryor, bed 11, and Robert Sayles, bed 12. Several of the patients, including Miles, Fuller and Daniels, were confined to bed. Nieves was described as one who shunned the companionship of others. Pryor was hospitalized for treatment of a post-duodenal ulcer and was administered sleep inducing medication. Defendant was receiving treatment for a recurrent knee injury but was not confined to bed.
Daniels and Pryor testified that they socialized with Sayles and defendant, sometimes playing baseball with a sponge wrapped tightly in belts of the hospital-issue terry robes and with defendant's cane. They last played that game during the evening of April 26. The following morning defendant's terry cloth belt, used the previous evening to wrap the sponge, was missing.
Pryor admitted a single homosexual encounter with the deceased. Daniels testified that defendant constantly harassed *124 Sayles by slapping him, prodding him with a cane and repeated arguments. Although Daniels said that he believed the harassment to be in jest, he testified that it was difficult for him to distinguish Clark's teasing and anger. Pryor testified to a knife-wielding argument between Sayles and defendant early in the evening of April 26.
The investigation of Sayles' death commenced the morning of April 27. Since Sayles was a known passive homosexual, examinations of the six remaining inmates of the ward for traces of recent homosexual activity were conducted. These tests were inconclusive. Police interviews of each patient were also inconclusive initially; each inmate maintained that he had neither seen nor heard anything unusual. Defendant admitted that he awoke after 1 A.M. to use the bathroom but claimed that he returned immediately to his bed. However, after Pryor's second interview he admitted that he possessed information relevant to the crime.
At the second trial Pryor testified that he went to sleep after 1 A.M. but was awakened by defendant calling Sayles' name. Defendant urged Sayles to come to him, whereupon Sayles got out of bed and followed defendant into the bathroom. He then heard the two go through the shower curtain and heard the toilet door lock. He said that he dozed but awoke to the sound of scuffling and gasping lasting for about a minute. Although he dozed again, Pryor said he awoke to see defendant drawing the bed covers up to Sayles' forehead. He testified that defendant then removed a wire from Sayles' radio and reentered the toilet. Soon thereafter Pryor heard the toilet flushing for what seemed a long while and then saw defendant emerge from the toilet area and walk to his bed. (An engineer subsequently testified that the prison plumbing system would allow items to be flushed down the toilet.) Throughout this sequence of events Pryor said he was lying on his stomach with his head turned to the left facing Sayles' bed. The bed to which Pryor was assigned faced the bathroom area. Pryor testified that the events which he observed and related did not appear unusual since he had *125 observed Clark and Sayles enter the bathroom together on several occasions.
During direct examination the assistant prosecutor explored with Pryor his motivation for finally revealing his observations of defendant and decedent. It was during this questioning that Pryor blurted out the fact that he had been given a polygraph examination. This testimony is the central issue of this appeal:
Q When did you decide to tell the police what you saw?
A After the lie detector test.
Q What time did you give them a statement?
A About five o'clock in the evening.
Q Was there anything unusual about the way they took the statement from you? Let me ask you. Who took the statement from you, do you remember?
A Well, I was given a lie detector test by Officer Toth, something like that, and I was in the room alone with him, so he was asking me the questions, and like, you know, they just didn't fit in right with my answers. So then after I found out, you know, like I couldn't fool them or trick them, nothing like that there, that's when I told him I would tell them what I know. Then he called Detective Kelly of the State Police.
After exploring the circumstances surrounding Pryor's final statement and at the close of direct examination the defense moved for a mistrial. The trial judge reserved decision on the motion pending cross-examination. However, he directed both parties to refrain from referring to subsequent polygraph examinations in questioning, and from referring to the test in summations. On cross-examination Pryor essentially reaffirmed his testimony given at the first trial; that is, he was finally moved to disclose his knowledge when informed that he was a suspect, and when urged to do so by fellow inmates. At the close of Pryor's testimony a renewed motion for a mistrial was denied.
Defendant was convicted of second-degree murder. His motion for a new trial was predicated on the issue raised here, i.e., Pryor's reference to the lie-detector test.
*126 As a general rule, the results of polygraph tests, whether favorable or unfavorable to the accused, are uniformly held inadmissible. A necessary corollary to this rule prohibits reference to the accused's refusal or offer to submit to a polygraph test. State v. Driver, 38 N.J. 255, 261 (1962). Similarly, indirect inference of the result is condemned. State v. Arnwine, 67 N.J. Super. 483, 495 (App. Div. 1961). See also, State v. LaRocca, 81 N.J. Super. 40, 46-47 (App. Div. 1963). Moreover, results of a polygraph test administered to a witness-accomplice who was aware of the defendant's guilt at the time of the test and implicates defendant upon notification of failure of the test is likewise inadmissible. State v. Parsons, 83 N.J. Super. 430 (App. Div. 1964). The results are not only inadmissible but also will necessitate a reversal if admitted. Driver, above, 38 N.J. at 262; Arnwine, above, 67 N.J. Super. at 498-499; Parsons, above, 83 N.J. Super. at 436.
The traditional reason for rejecting testimony referring to polygraph testing, as first enunciated in Frye v. United States, 54 App. D.C. 46, 293 F. 1013 (1923), is the lack of scientific acceptance as a reliable and accurate means of ascertaining truth or deception. See Driver, above, 38 N.J. at 261. While certain exceptions to the rule of inadmissibility have developed, the recent opinion in State v. McDavitt, 62 N.J. 36, 44 (1972), recognizes the tenacious character of this conclusion. The recent Report of Supreme Court Committee on Criminal Procedure on Polygraph Tests, 96 N.J.L.J. 525, 541 (1973), notes that judicial opinions themselves are generally unreliable measures of the reliability of polygraph tests. The committee calls for a thorough reexamination of prior case law to discard anachronistic standards and to establish fresh criteria commensurate with current knowledge. Although the majority report concludes that the test has attained general scientific acceptance, it opts to continue the exclusionary rule for "substantial reasons of policy." 96 N.J.L.J. at 542.
*127 Since a direct or indirect reference to the polygraph results invokes the rule, each incident of testimonial reference raises some dispute whether the reference has conveyed the prohibited information. In Arnwine, an incest prosecution, this court found that the polygraph examiner's testimony as to defendant's admission, "If Sandra said I did this, I probably did it," upon notification of the test result, constituted an indirect reference of the result. Arnwine, 67 N.J. Super. at 498-499. The inference from the witness' testimony that he changed his testimony after "the lie detector test showed that I had been ." was held to be "little if anything short of unequivocal to the effect that the polygraph test he took disclosed that he had been lying when he first told the police that the defendant was not with him when the crimes were committed." Parsons, 83 N.J. Super. at 435-436. Unquestionably, here, Pryor's testimony conveyed the inference that his previous statements to the authorities had been less than truthful.
Defendant urges that State v. Parsons is dispositive; the State contends that the case is distinguishable. In Parsons this court found it immaterial that the test was administered to a witness rather than to defendant:
It matters not that the damaging evidence was elicited by means of disclosure of the result of a lie-detector test administered to a witness rather than to the defendant, where the witness is one who when he took the test knew whether the defendant was guilty or not. * * * The prejudicial effect is logically identical. Nor does it matter that the disclosure is by indirection rather than directly. * * * [83 N.J. Super. at 436; emphasis added]
All of our decisions reveal a concern that an unreliable or highly suggestive mechanical device will prejudicially bolster testimony or admissions of persons in a unique position to know the truth  the accused, an accomplice, or an eyewitness.
The State also argues that any error in allowing mention of Pryor's lie-detector examination is harmless error; however, *128 as noted, Parsons indicates that the plain error rule is not applicable in this context, and we cannot conclude that the reference here was harmless beyond a reasonable doubt.
The disclosure of the administration of the polygraph test occurred in the course of the State's effort to fortify Pryor's testimony during direct in anticipation of cross-examination. Generally, credibility cannot be rehabilitated until attacked. Parsons, 83 N.J. Super. at 437. The State's reliance on State v. Holley, 34 N.J. 9 (1961), is misplaced. In Holley the State was anticipating defendant's plea of self-defense rather than engaging in premature bolstering of a state witness. However, unlike Parsons, this case does not involve an intentional or planned attempt by the prosecution to elicit the existence and results of a polygraph examination. It appears that both counsel apparently expected a repetition of Pryor's testimony at the first trial. This distinction, however, we find to be of no relevance here.
While we do not accept defendant's argument that conviction at the second trial demonstrates that the reference to Pryor's polygraph examination was patently prejudicial, we agree that its capacity to prejudice the jury was significant, since Pryor was the only witness to testify about events proximate to Sayles' death. While a review of the evidence adduced by the State at trial reveals a well-developed, albeit circumstantial, case of defendant's guilt, that case relied heavily on Pryor's credibility and we do not believe that justice will be served by speculating on the effect the polygraph reference had on the jury's evaluation of his testimony.
Reversed and remanded for a new trial.